# PEWABIC MINING COMPANY *v.* MASON.

## MARCUS- *v.* MASON.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE WESTERN DISTRICT OF MICHIGAN.

Nos. 1340, 1416.   Argued March 16, 17, 1892. — Decided May 16, 1892.

When a sale of property is decreed by a court of equity as the result of a
litigation, it is the policy of the law that it shall not be set aside for
trifling causes or matters which the complaining party might have at-
tended to.

When such a sale is attacked the court will scrutinize all previous action of
the parties during the litigation, which may throw light upon or explain
their action at the sale.

It cannot be tolerated that either party should designedly wait until the
property has been struck off to the other, and then open the bidding and
defer the sale by an increased offer.

When a corporation owning real estate is wound up by reason of the expi-
ration of the term for which it was incorporated, and its real estate is
sold by decree of court under directions of a master, stockholders may
purchase it, and there is no fraud on other stockholders if a part of the
stockholders combine to purchase it for the benefit of an adjoining prop-
erty owned by them.

Litigants prolonging litigation to the extent of their ability in a suit in
equity seeking the sale of real estate, and prolonging their resistance by
having the sale postponed after the decree, cannot complain if it takes
place finally in a time of financial depression.

The court decreed in this case that the assets of the mining company should
be sold at public vendue, that the debts of the company should be ascer-
tained by a master as a basis for the bid, and that the sale should take
place on the confirmation of his report. *Held,* that it was not intended
that the sale should be delayed till every claim arising since the com-
mencement of the suit should have passed to final judgment; but that a
mere statement of the amount should be presented as a basis for fixing
an upset price.

No leave of court is necessary to enable a litigating stockholder to bid at
such sale of the assets of the corporation under a decree in the suit in
which he is a litigant.

The provisions in equity rule 83 respecting exceptions to a master's report
do not apply to a report of a mere ministerial matter like a sale, but only
to a report upon matters heard and determined by him.

The master's sale under the decree was advertised to take place in Michigan

on Saturday, January 24. Late in the evening of Friday, January 23, the master received from M. a telegram from Boston, in Massachusetts, stating that he was a holder of nearly 3000 shares of stock, that he had just heard of the sale, that it was to take place on the Jewish Sabbath, that his Jewish friends wished to buy but would not attend on the Sabbath, and asking for a postponement. The sale took place on the 24th as announced, whereupon, on the 26th M. again telegraphed protesting and making an offer in advance of the purchaser's bid. The master reported this in his report of the sale. The sale was confirmed. The day after the confirmation M. asked leave to intervene and have the sale set aside. In the subsequent proceedings no proof was offered that M. was a shareholder, and it appeared affirmatively that he had no financial responsibility. *Held*, that if it had been planned he could not have been more opportunely ignorant before the sale, or more accurately informed after the confirmation, and that his intervention was too late.

THE court stated the case as follows :

These cases spring out of the same litigation and may be considered together. The preliminary facts are these : On April 4, 1853, the Pewabic Mining Company was organized as a corporation for mining copper, under the laws of the State of Michigan. The term of the corporation was for thirty years, and expired April 4, 1883. The capital stock at that time consisted of 40,000 shares, of $25 each. Notwithstanding the termination of the life of the corporation, the directors then in office continued its business without change. On March 26, 1884, at a meeting of the stockholders, by a vote of 27,919 against 6754 shares, the directors were authorized to dispose of the property at a sum not less than $50,000, and a sale was directed to be made to a new corporation, to be organized on the basis of 40,000 shares, the shares in the old to be exchanged in full payment for shares in the new, the stockholders in the old, not electing to join the new, to receive their *pro rata* interest in money. The present appellees were stockholders in the old corporation, owning 2650 shares, and protested against these resolutions. A new corporation was organized, but, before the transfer had been made, the appellees filed their bill in the Circuit Court of the United States for the Western District of Michigan, the purpose of which was to enjoin the proposed transfer of the property of

the old to the new corporation, and to have it sold at public auction, and the proceeds divided ratably among the stockholders. This bill was filed March 31, 1884. On final hearing a decree was entered sustaining the prayer of the bill, and directing a sale of the property at public vendue, for cash, to the highest bidder, and referring the cause to Peter White as special master, with power to ascertain the assets and debts of the mining company, and directing that, after ascertaining and making report thereof to the court, he should proceed to sell the property at public vendue. (25 Fed. Rep. 882.)

From that decree an appeal was taken, and thereafter this court sustained the decree so far as it ordered a sale. In reference to the accounting before the master, it, however, directed that it should be widened so as to include the proceedings of the directors since the dissolution of the corporation. The opinion of this court was announced January 13, 1890. (133 U. S. 50.) The mandate was issued February 6, and was filed in the Circuit Court on March 14, 1890. In the execution of the decree a sale was made by the master on the 24th of January, 1891, more than a year after its affirmance by this court, the purchasers being Thomas Henry Mason and William Hart Smith, two of the original plaintiffs, and the price paid being $710,000. The sale was confirmed; and to set aside the confirmation and to open the sale were the matters sought to be accomplished by the three appeals taken in these two cases.

The specification of errors in the Pewabic Mining Company case was as follows:

" 1. That the court below erred in overruling the first exception taken by the appellant to the report of the sale of the special master, viz.: 'That the said sale mentioned in said report was made before the debts and the assets of said defendants, the Pewabic Mining Company, were ascertained as provided for and required in the decree entered in said cause.'

" 2. That the court below erred in overruling the fifth exception taken by the appellant to the report of the sale of the special master, viz.: 'Because said property was sold

for an inadequate price or sum, and for much less than it is worth.'

"3. That, under the mandate of this court, nothing less than 'all the assets and property of the said Pewabic Mining Company' 'in one body' could be sold by said master; but that by the order of the court confirming the sale, an exception was made therefrom of the claims against the directors, so that in fact all of said assets and property were not sold in one body.

"4. That in disregard of the rules governing the equity practice of the Circuit Courts of the United States, said report was confirmed within one month from the filing of the report in court.

"5. That promptly and without laches, and before any confirmation of said sale had been made as authorized by the rules governing such practice, and before any confirmation whatever had become absolute, beyond the power of the said Circuit Court to set aside, *bona fide* and well assured offers of a price largely advanced beyond the highest bid at the reported sale were presented to this court in support of an application, from the party so offering and of this appellant, for the setting aside of said reported sale, and the ordering of another sale.

"6. That Thomas H. Mason and William Hart Smith, complainants in this cause, bid at said auction, and that their bid, as the highest bid, was accepted by the special master, and the property exposed to sale was struck off to them as purchasers, when: (*a*) They had not obtained leave from the court to bid at said auction; (*b*) They had advised the court in the matter of the sale, and pressed forward the sale as parties interested only as sellers to obtain the highest price, and not at all as buyers interested to obtain the property for the lowest sum, and that therefore they had no right to bid; (*c*) Before so bidding they had concerted with the Quincy Mining Company a scheme to take the property (if bought) off their hands at a very large personal profit; and they did not disclose this fact to the court in any of their representations to the court, in the matter of the sale, and they procured

affidavits from officers of the Quincy Company and presented them to the court, in which this fact was not disclosed; (*d*) Neither did they disclose this fact of their having secured a sale of this property to the Quincy Mining Company at a large profit, to the master, their fellow stockholders or the other bidders at said sale, nor allow the same then and there to be disclosed, but concealed the same; (*e*) On the other hand, while they had obtained this contract and agreement with the Quincy Mining Company, in accordance with which they were to buy this property for the purpose of transferring it to that company, they advised the court that said Quincy Mining Company would, at the auction ordered, bid as an independent bidder, in fair and free competition, and pressed forward the sale for this reason, that if deferred the Quincy Company might not bid, concealing from the court this contract and agreement, and all their relations with the Quincy Mining Company in this matter; (*f*) As a matter of fact the scheme was carried out. The complainants were both buyers and sellers. They advised the court, made the sale, purchased the property, and resold it at an advance which they pocketed themselves for their own personal benefit, and in fraud of the other stockholders.

"7. That as against a bid accepted under all these circumstances, the Pewabic Mining Company, having, for a reasonable time, an undoubted right to elect whether to ratify and enforce the sale, and to demand and receive into its own assets the advance upon the sum bid, which was to be paid to the accepted bidders, or to have the accepted bid rejected, and the biddings reopened, has exercised that right entirely within such reasonable time, and is not guilty of laches in the premises.

"8. That the advance price offered to be bid for the property sold, in case a new sale should be ordered, was large enough to induce and require the court to open the biddings and to order such resale, and that such order was amply secured and guaranteed, and was seasonably made for that purpose."

In Marcus's case the following additional specifications were filed.

" 1. Because, as a large stockholder, and as making a *bona fide* offer of a great advance over the amount bid at the sale, he had a right to intervene."

" 4. If the sale had not been confirmed prior to the filing of Marcus's petition, the *bonà fide* offer of so large an advance price was proper ground for opening the sale and ordering a resale.

" 5. Even if the sale had been confirmed prior to the filing of Marcus's petition, the action of the court at the same term in entertaining the petition and in directing order of notice to issue thereon, suspended the operation of the order of confirmation.

" 6. But, even if the sale had been regularly confirmed and the decree of confirmation had become of full effect, under all the circumstances of this case the sale should have been opened and a resale ordered.

" 7. The petitioner, Marcus, has not been guilty of laches which should defeat the granting of his petition."

*Mr. Thomas H. Talbot* for the Pewabic Mining Company, and *Mr. Robert M. Morse* and *Mr. J. Lewis Stackpole* for the Pewabic Mining Company and Marcus. *Mr. Russell C. Ostrander* was on the briefs for the company and for Marcus, and *Mr. Charles E. Hellier* on the brief for Marcus.

I. The directions of the mandate have been disregarded, in that the debts and assets of the Pewabic Company were not finally ascertained and adjudicated before a sale of any of the property of the company was ordered and made.

II. The property was sold for an inadequate price.

III. Under the mandate of this court, nothing less than "all the assets and property of the said Pewabic Mining Company in one body" could be sold by said master; but by the order of the court confirming the sale, an exception was made therefrom of the claims against the directors, so that in fact all of said assets and property were not sold in one body.

IV. The report of sale was confirmed, in disregard of the

rules governing the equity practice of the Circuit Courts, within thirty days from the filing of the report.

V. Before any valid confirmation of the sale, *bona fide* offers for a largely advanced price were presented to the court below on an application for a resale.

VI. The sale to the complainants, made without leave of the court to bid, in pursuance of a secret scheme entered into with a rival company, in which they were large stockholders, to turn over the property to it at a large private profit, undisclosed to either the court, the master, or other bidders, is contrary to the plainest principles of equity, and must be annulled. *Mason* v. *Pewabic Mining Co.*, 133 U. S. 50; *O'Connor* v. *Richards*, San. & Sc. 246; *Ryder* v. *Gower*, 6 Bro. P. C. 306; *Sidny* v. *Ranger*, 12 Sim. 118; *Byrne* v. *Lafferty*, 8 Ir. Eq. 47; *Guest* v. *Smythe*, L. R. 5 Ch. 551; *Ex parte Lacey*, 6 Ves. 625; *Lister* v. *Lister*, 6 Ves. 631; *Nelthorpe* v. *Pennyman*, 14 Ves. 517; *Downes* v. *Grazebrook*, 3 Meriv. 200; *Michoud* v. *Girod*, 4 How. 555; *Ex parte James*, 8 Ves. 337; *Randall* v. *Errington*, 10 Ves. 423; *Ex parte Bennett*, 10 Ves. 381; *Parkes* v. *White*, 11 Ves. 210, 226; *Hatch* v. *Hatch*, 9 Ves. 292.

VII. The defendants had the right of election between a confirmation of the sale and receipt of the profits of the buyers on the one hand, and of its annulment on the other. This election is a question independent of the date of confirmation by the court below. They have seasonably exercised it and have been guilty of no laches.

VIII. The advance price offered to be bid for the property sold, in case a new sale should be ordered, was large enough to induce and require the court to open the biddings and to order such resale, and such offer was abundantly secured and guaranteed and was seasonably made for that purpose.

IX. The petitioner Marcus, as a large stockholder and as making a *bona fide* offer of a great advance on the amount bid at the sale, had the right to intervene.

*Mr. Don M. Dickinson* (with whom were *Mr. Thomas B. Dunstan* and *Mr. Alfred Russell* on the brief) for appellees.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The question in this case is whether the master's sale shall stand. It may be stated generally that there is a measure of discretion in a court of equity, both as to the manner and conditions of such a sale, as well as to ordering or refusing a resale. The chancellor will always make such provisions for notice and other conditions as will in his judgment best protect the rights of all interested, and make the sale most profitable to all; and after a sale has once been made, he will, certainly before confirmation, see that no wrong has been accomplished in and by the manner in which it was conducted. Yet the purpose of the law is that the sale shall be final; and to insure reliance upon such sales, and induce biddings, it is essential that no sale be set aside for trifling reasons, or on account of matters which ought to have been attended to by the complaining party prior thereto. And in this respect regard may properly be had to all that has transpired before, for the conduct of the parties, their acts and omissions, may largely interpret their action at the time of the sale. In order, therefore, to understand fully the merits of these present appeals we must notice the course of the litigation and the conduct of the parties prior to the sale.

In 1883 the Pewabic Mining Company ceased to exist; its property then belonged to the different stockholders as tenants in common. They could not agree among themselves. The minority appealed to the courts, and there the litigation was carried on for years; the minority insisting upon a sale, the majority upon the transfer of the property to a new corporation. At the end of six years the controversy was finally determined by this court; and in January, 1890, a decree of the Circuit Court directing a sale was affirmed. During these years each party was fully aware of the purpose and contention of the other, and, therefore, had ample time to prepare for whatever might be the outcome of the litigation. In January, 1890, as stated, the final decision was announced; at that time each party knew that a sale was to be had, and

that if it intended to buy it must make all its arrangements therefor, and in such arrangement must be included a determination of the full amount it was willing to bid for the property.   It cannot be tolerated that it be in the contemplation of either to wait until after the property has been struck off to the other, and then open the bidding and defer the sale by an increased offer.   Though the final decision in favor of the sale was announced on January 13, 1890, the sale was not made until January 24, 1891, more than a year thereafter. It was advertised to take place, first on October 30, 1890, but on application of the defendant was postponed till December 20, and again, on like application, to January 24, 1891.   It was fully advertised not only in the local, but also in Detroit, New York, Boston and Chicago papers.   There can be no pretence, therefore, of haste or a lack of notice, personal and general.

It is insisted by defendant that the plaintiffs were acting in the interest of the Quincy Mining Company, a corporation owning adjoining and rival mining property; that solely in its interest, and not for the benefit of the stockholders in the Pewabic Mining Company, they carried on this litigation, secured the sale, bought at it, and, in final consummation of the wrong to their coöwners, have since their purchase conveyed the property to the Quincy Mining Company.   There is a counter-charge by the appellees that the majority of the stockholders who sought to convey the property to the new corporation, and who have been practically the adverse party in this litigation and who may hereafter be considered as described by the term defendant, were acting in the interest of the Franklin Mining Company, another corporation also owning property adjacent to the Pewabic mine.   We are inclined to think there is truth in each allegation, and that it is not difficult to read between the lines that the minority of the stockholders were interested in the Quincy and the majority in the Franklin Company, and that these respective corporations were seeking to obtain possession and control of the Pewabic.   But there was no wrong or fraud in this, and no deception.   Each party evidently knew the interests and

relations of the other.  In the answer originally filed by the defendant, in 1884, it was charged upon the plaintiffs that they were acting in the interest of a rival mining company.

It is also contended that the sale was made at a time when a severe financial condition existed in the country, especially affecting mining stocks and mining property.  But the sale had once been postponed on this ground at defendant's instance, the affidavits as to such depression were met by counter-affidavits on the part of the plaintiffs, and it is a doubtful question, under those affidavits, whether such depression did in fact exist.  Even if it were clear that it did, that would not necessarily be a reason for further postponement.  There comes a time in the history of a litigation like this when, though the times may be depressed, there must be a sale.  The rights of the one party are to be respected as well as those of the other ; and it does not always lie in the mouth of one who, by strenuous and protracted resistance, has delayed for years a sale, to claim still further delay on account of the then depressed financial condition.  A speedy end of litigation, as speedy as is consistent with the rights of each party, is to be desired ; and they who prolong litigation by appeal from court to court must not complain if sometimes they find themselves, at the end, under burdens which would not have rested upon them but for such delay.  We think it must be affirmed that, so far as the general equitable considerations attending these cases are concerned, they make in favor of the appellees, and that a court should not for any light or technical reason disturb a sale consummated at the end of seven years of litigation.

We pass, therefore, to some of the special matters presented.  First, it is claimed that under the terms of the decree the sale was prematurely made.  That decree directed " that all the assets and property of the said Pewabic Mining Company be sold at public vendue, for cash, to the highest bidder : *Provided, however,* That if at such sale the bid for the aggregate of the property and assets of said company should not be in excess of fifty thousand dollars above the amount of the debts of said company existing at the time of the sale hereinafter

decreed, then that the arrangement for the sale of the property of said company made at the stockholders' meeting in Boston, on the 26th day of March, A.D. 1884, and as set up in the defendant's answer, shall be carried out under the direction of the special master hereinafter designated. . . . It is further ordered, adjudged and decreed that this cause be, and is hereby, referred to Peter White, as special master," for the following purpose and with the following powers, to wit, " That said master proceed to ascertain the assets and property and the amount of the debts of the said Pewabic Mining Company," and " after ascertaining the assets and debts of said company and making a report thereof to this court, as hereinabove provided, and the confirmation thereof, said master shall proceed to sell said property at public vendue, to the highest bidder, in one body, after giving the notices of said sale required by law and the practice of this court, and that he make report thereof, and that said property be offered for sale at the front door of the court-house, in the village of Houghton, in the county of Houghton and State of Michigan." This decree was affirmed by this court, the only modification being in respect to an accounting with the directors for moneys received by them after the expiration of the charter. It is insisted that by these terms no sale could be had until there had been a final ascertainment, a judicial determination, of all debts owing at the time of the sale, as well as of all assets, including therein claims due to the corporation; that by the modification directed by this court, there was also to be had an accounting with the directors, and until that was finished no sale could be had, because it was not as yet judicially ascertained whether they owed the corporation or the corporation owed them; in other words, whether there were more debts or more assets. The master to whom this matter was referred reported that all debts of the corporation which existed at the commencement of the suit had been paid; that all the personal property had been disposed of, leaving only the mine and its appurtenances; and that the total amount of all the claims against the company, added to $50,000, was less than the amount for which he had the pledge of a responsible bid,

secured by a certificate of stock. This report was filed September 18. On November 4 the court confirmed so much of the report as found that the indebtedness due at the time of the commencement of the suit had been paid. Other exceptions to the report were sustained, but the court added these findings and orders:

" Fourth, that for the purpose of fixing the upshot price at the sale the amount of such indebtedness on said day is hereby found and determined by the court to have been the sum of $80,191.20; fifth, that the last-named sum, with interest thereon from the last-named date, plus $50,000, shall be the starting point for the bidding at the sale; sixth, that the sale heretofore decreed in this cause do take place after six weeks' notice thereof subsequent to the date of this order shall have been given by said master, who is hereby directed to postpone sale until after such notice and then to make said sale; seventh, all questions of any of the parties with respect to their dealings with the indebtedness of said company or any part thereof are hereby expressly reserved."

The contention of the appellees is, that the purpose of requiring an ascertainment of the debts prior to the sale was the fixing of an upset price, in order that, if no bid be made in excess of $50,000 above the amount of the debts of said company, the arrangement made in 1884 by the majority of the stockholders for the transfer of the property to the new company should be carried into effect, and that it was not contemplated that the sale should be absolutely postponed until after a final judicial determination of the amount of the several claims against the corporation — a matter which, by reason of possible appeals from the circuit to this court, might delay the sale for many years. They further insist that the conduct of the appellant showed a purpose to promote delay, and, therefore, that, even if a strict construction sustained appellant's claim, the court was justified in modifying the mere order of procedure. They urge, that though all debts due at the time of the commencement of the suit, and when the life of the corporation was ended, were paid, the defendant caused to be presented a series of claims, for services of counsel and

officers of the Pewabic Mining Company, and for money claimed to have been loaned to it, and then, on behalf of that company, filed exceptions to the legality and sufficiency of these claims, and having thus a form of controversy arranged before the master, neglected and delayed in the matter of hearing the same; and in support of this they call attention to a letter written by the master to the trial court in response to inquiries as to why the report was delayed.

With respect to this last matter it is sufficient to say that obviously the defendant was dilatory; and with reference to the construction of the decree, we think the appellees are right. It cannot be that the sale was intended to be the last act of this litigation, and that it must be delayed till every claim arising since the commencement of the suit had been passed to final judgment; for as the property remained in the hands of the appellant, new claims for care and services might arise as fast as old ones were determined; and, indeed, there were at the time of the sale no debts save those arising since the commencement of the suit. The purpose of the decree was a sale, provided such sale would produce more than the plan proposed by the majority of the stockholders; and it was enough, the debts due at the time having all been paid, that a mere statement of the amount of the claims be presented, and upon that the upset price be fixed. It will also be noticed that the court for the purposes of the sale found and determined the amount of the indebtedness, and that ample provision was made in the orders for the rights of all creditors, and the collection of all debts, and a fund was received from the sale large enough to satisfy all possible claims — $710,000, instead of the $50,000 named in the resolution of the company in March, 1884. We think, therefore, this contention of the appellant must fail.

A second contention is, that the sale was made to complainants without leave given by the court to them to bid. But no leave was necessary. The complainants were not the vendors. The English practice does not obtain in this country. A sale made by a special master under the directions of a court of chancery is not a sale made by either of

the parties to a litigation or under his direction. The master is a representative of the court, as a marshal or sheriff is in an action at law. He is not under the control of either party; he is not the agent of either to make the sale. At such public judicial sale, either party as a rule may bid. *Richards* v. *Holmes*, 18 How. 143; *Smith* v. *Black*, 115 U. S. 308; *Allen* v. *Gillette*, 127 U. S. 589; *Smith* v. *Arnold*, 5 Mason, 414, 420. In that case Judge Story said: "In sales directed by the court of chancery, the whole business is transacted by a public officer, under the guidance and superintendence of the court itself. Even after the sale is made, it is not final until a report is made to the court and it is approved and confirmed."

In *Blossom* v. *Railroad Company*, 3 Wall. 196, 208, this court said: "Officers appointed under such decrees, and directed to make such sales, have the power to accomplish the object; but they are usually invested with a reasonable discretion as to the manner of its exercise, which they are not at liberty to overlook or disregard. Acting under the decree, they have duties to perform to the complainant, to the vendor and purchaser, and to the court, and they are bound to exercise their best judgment in the performance of all those duties. Such an officer, in acting under such a decree, if directed to sell the property, should adopt all necessary and proper means to fulfil the directions; but he should, at the same time, never lose sight of the fact that, unless he is restricted by the terms of the decree, the time and manner of effecting the sale are, in the first instance, vested in his sound discretion. Usual practice undoubtedly is, that the officer in selling the property acts under the advice of the solicitor of the complainant; but it cannot be admitted that his advice is, under all circumstances, obligatory upon the officer."

Nor is this a case where the complainants stood in any such fiduciary relations as forbade them to purchase or prevented even their acting for others in bidding. They had litigated with the defendant for years in establishing the right to have that property sold; and when finally they had succeeded in getting a decree that it be sold, they did not then assume a

duty to the defendant and become charged with the care of its interests, or become incapacitated from bidding freely for themselves or for others. None of those matters of a fiduciary character, which sometimes enter into and avoid sales, existed in this case.

Another matter complained of is that the sale was prematurely confirmed. It took place on the 24th of January, 1891, and the report of sale was filed February 4. On the 7th of February an order *nisi* was entered, that, unless cause to the contrary was shown within eight days, the sale would be confirmed. On February 13 reasons why the sale should not be confirmed were filed by the defendant, and on the same day exceptions to the report of sale. On the 2d day of March, upon notice, the objections and exceptions of the defendant were heard by the court and overruled, and the sale confirmed.

In support of this complaint reliance is placed on general equity rule number 83 : "The master, as soon as his report is ready, shall return the same into the clerk's office, and the day of the return shall be entered by the clerk in the order book. The parties shall have one month from the time of filing the report to file exceptions thereto, and, if no exceptions are within that period filed by either party, the report shall stand confirmed on the next rule day after the month is expired." It is worthy of note, however, that exceptions were filed, were heard and determined by the court, and no objection was made by the appellant to the time of the hearing, or any suggestion of a right to longer time in which to file exceptions. It would seem that if there were error in this respect, the appellant was not in a position to avail itself thereof. But there was no error. Rule 83 has no reference to a report by a master of a mere ministerial matter like a sale, but only to his report upon matters heard and determined by him. In *McMicken* v. *Perin*, 18 How. 507, 510, it was observed: "In *Story* v. *Livingston*, 13 Pet. 359, this court decided that no objections to a master's report can be made which were not taken before the master; the object being to save time, and to give him an opportunity to correct his errors and reconsider his opinion." But surely in the matter of a sale

there is no opportunity for objections before the master, or any correction by him of his errors or any reconsideration of his opinion. The course pursued in this case in reference to the confirmation was the correct practice; an order *nisi* followed if no objections were taken in time by an order of confirmation. In 2 Daniell's Chancery Pleading and Practice, page 1274, 4th Am. ed., the author says: "After the report has been filed, and an office copy taken by the purchaser, he must, at his own expense, apply to the court by motion, that the purchase may be confirmed. This motion requires no previous notice, and the order made upon it will be that the purchase may be confirmed *nisi ; i.e.* unless cause is shown against it within eight days after service of the order. The purchaser must, at his own expense, procure an office copy of this order from the registrar, and he may serve it on the solicitors for all the parties in the cause. If no cause is shown within the eight days, the purchaser must, at his own expense, apply to the court to confirm the order absolutely, which will be ordered of course, on the production of an affidavit of the service of the order *nisi*, and a certificate of no cause having been shown." And, again, on page 1305, in which he thus notes the reason of the rule in respect to a report of sale: "With respect to which it is to be observed, that the object of requiring this report to be confirmed is not to enable the parties to bring the decision of the master under the review of the court, but to afford time between the service of the order *nisi* and the absolute confirmation of the report, to others to come in and open the bidding, so as to secure the sale of the estate to the best possible advantage." And in 8 American and English Encyclopædia of Law, p. 254, the practice is thus stated : "The master or commissioner making the sale should report his action to the court, to the end that the sale may be confirmed. A motion to confirm the sale, with notice to the parties adversely interested to the confirmation, should be made. Confirmation *nisi* will be ordered, to become absolute within a designated time, unless cause is shown against it. If cause is not shown it stands confirmed." See also *Mayhew* v. *West Virginia Oil Co.*, 24 Fed. Rep. 205,

215, and as to the practice in the state courts of Michigan, Jennison's Ch. Pr. p. 157, Rule 79. We think, therefore, that this objection also must be overruled.

The remaining objections made by the appellant can be more conveniently considered in connection with the appeal of Alfred A. Marcus. The first appearance of Marcus in this litigation was in this wise: The sale was made on the 24th of January, and at the village of Houghton, county of Houghton, and State of Michigan. The 24th was Saturday, and late in the evening of January 23 the master received this dispatch:

"BOSTON, MASS., *January* 23, 1891.

"To PETER WHITE, special master:

"Please postpone sale of Pewabic mine; just found out the sale on our Jewish Sabbath; never notified of sale until to-day. We hold nearly three thousand shares. Our Jewish friends in London will buy the mine. There are other Jewish buyers who will not attend sale on Saturday; will most cheerfully pay all expenses for postponement; if not, please announce at sale 'we will protest against this legality.'

"ALFRED A. MARCUS."

On Monday, the 26th, he received the following:

"BOSTON, MASS., *January* 26, 1891.

"To PETER WHITE, special master:

"You ignored my dispatch; sold the Pewabic mine. I protest against the sale, as you were bound to do all to get the highest price. I claim the right now to bid seven hundred twenty-one thousand dollars cash, being twenty thousand dollars more than bid at the illegal sale. I shall claim the mine, being the highest bidder, and protest against any transfer being made to any one except myself, and shall hold you personally responsible.

"ALFRED A. MARCUS."

In his report of sale he gave copies of these dispatches, simply adding that the sender of the dispatches was wholly

unknown to him, and that he paid no attention whatever to them. On the 3d day of March, the day after the sale had been confirmed, and more than five weeks after the sale had been made, Marcus filed a petition for leave to intervene, in which he alleged that "he is the owner of 3017 shares of the capital stock of the Pewabic Mining Company; that he, for himself and other parties, whose names he is willing to disclose, was desirous and fully intended to be present or represented at the sale of the property of the said Pewabic. Mining Company by the special master duly appointed by this honorable court in the above-entitled cause; that he was ready to and would have bid at said sale and paid a large amount of money for the property of said company advertised for sale by said special master; that on January 23, 1891, that being the day before the sale of said property took place, your petitioner discovered for the first time that the sale was advertised for Saturday, January 24; that thereupon and immediately your petitioner, using all haste and dispatch possible, sent by telegraph a message to the said special master, a copy whereof is hereto annexed, marked A, asking to have the sale of said property postponed, at his own expense, for the reason that he was never notified of the sale until said date, and that said sale was advertised to take place on the seventh day of the week, which is the Sabbath of your petitioner, and upon which day he is forbidden by his creed to do any business." He further alleged that the master ignored the dispatch and sold the property for an inadequate sum, and for much less than it was worth; that his offer on January 26 was *bona fide*; that he was willing and ready to pay all the expenses of a resale; and that he would start with a bid not less than $800,000, afterwards by amendment raised to $900,000, and would give a bond with satisfactory sureties for his good faith and ability to carry out his offer. On the presentation of this petition the parties were ordered to show cause why it should not be granted. It is a singular fact that his first appearance in the case was the day before the sale, and his first appearance in court the day after the confirmation. If it had all been planned, he could not have

been more opportunely ignorant before and more accurately late after. To this order to show cause the parties appeared, testimony was taken, and a hearing had. It is worthy of note that, outside of the petition of Marcus, there is no evidence of his ownership of stock, and nothing in that tending to show how or when he obtained title to that which he claimed to own; neither is there anything to show what steps he had taken, prior to the sale, to inform himself of what was going on in the affairs of the company. It would seem from the multitude of judgments and attachments against him appearing on the records of the courts in Boston, that he was of no financial responsibility. On the other hand, it is also true that the affidavits of several responsible parties were presented, showing that Marcus was a man of large transactions; that he was an orthodox Jew, who did no business on Saturday; and that the parties named were willing to give the proffered bond if a resale were ordered. It would not be a strained inference from the testimony that Marcus was acting for others, and was really put forward with the idea of introducing a new factor into the litigation. But we deem it unnecessary to inquire into the real character of this intervention. It is enough that it comes too late. Surely no one would suppose that an officer having charge of the sale of property of such value, a sale made at the end of prolonged litigation, should at the last moment, in response to a dispatch from a stranger, postpone the sale. The master's action was unquestionably proper, and if the party desired the intervention of the court, his duty was to apply at once and not wait until after confirmation; for then the rights of the purchaser are vested, and something more than mere inadequacy of price must appear before the sale can be disturbed. Indeed, even before confirmation the sale would not be set aside for mere inadequacy, unless so great as to shock the conscience. See *Graffam* v. *Burgess*, 117 U. S. 180, 191, where the matter is discussed at some length by Mr. Justice Bradley. As the price bid by the appellees, and at which the property was struck off to them, was about $580,000 in excess of the upset price, it is hardly necessary to say that there is no shocking inadequacy of price.

In conclusion, we may add that, after reviewing all the facts disclosed by these records in the light of the prior history of the litigation, it seems to us that the equities of the case are decidedly with the appellees, and the decrees will be

*Affirmed.*

Mr. Justice Gray did not hear the argument and takes no part in the decision of this case.