## BETHLEHEM STEEL CO. v. INTERNATIONAL COMBUSTION ENGINEERING CORPORATION.

## SAME v. COMBUSTION ENGINEERING CORPORATION.
### No. 491.

Circuit Court of Appeals, Second Circuit.
July 17, 1933.

Charles S. Aronstam, of New York City (Edmund J. Fixman, of New York City, of counsel), for appellants.

White & Case, of New York City (Joseph M. Hartfield, Alfred N. Heuston, and J. A. Gifford, all of New York City, of counsel), for appellee Reorganization Committee.

Cravath, de Gersdorff, Swain & Wood, of New York City (Hoyt A. Moore, Leonard D. Adkins, and W. W. Robison, all of New York City, of counsel), for receivers-appellees.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Edwin S. S. Sunderland and Henry C. Alexander, both of New York City, of counsel), for appellee Creditors' Committee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

This appeal is from decrees of sale of the property of the International Combustion Engineering Corporation and the Combustion Engineering Corporation, both of which were held in receivership.

On December 19, 1929, receivers were appointed for the International Combustion Engineering Corporation, a holding company, having stock control of four subsidiary corporations. The principal business of the parent and subsidiary corporations was the manufacture, construction, and installation of steam-producing equipment. In the United States this business was carried on by the various subsidiaries of the Combustion Corporation of America, a subsidiary of the International Combustion Engineering Corporation. The actual contract and construction work was done, principally, by the Combustion Engineering Corporation. Receivers for the last-mentioned company were appointed at the time of the appointment of receivers for the parent company. A few days later receivers were also appointed for all but one of the operating subsidiaries, to wit, for the Coshocton Iron Company, Hedges-Walsh-Weidner Company, and Heine Boiler Company. On December 19, 1929, receivers

were appointed also for another subsidiary, International Combustion Tar & Chemical Corporation. The Tar Corporation, since receivership, has been reorganized and sold, and the Hedges-Walsh-Weidner Company receivers were discharged and operations were continued by a board of directors elected by the holders of the preferred stock, none of which was owned by the parent company or any of the subsidiary or affiliated companies.

During the receiverships, the business was conducted with heavy losses, particularly during 1931 and 1932, and receivers' certificates amounting to about $1,500,000 were issued and outstanding in April, 1932. Loans were made to the various subsidiaries. During the administration of the receiverships, many necessary orders were entered arranging loans on certificates; also orders relating to the affirming and disaffirming of leases and contracts.

With the proceeds of the sale of the Tar Corporation, the outstanding receivers' certificates were reduced to $1,075,000, and, when such certificates were renewed, there was pledged as security therefor, in addition to its other collateral, the capital stock of the International Combustion, Limited, a British, company. The receivers' certificates were from time to time reduced to $820,000, which were outstanding at the time of the sale, and the stock of the British company as well as other collateral was pledged at that time. The parent company had no income as a result of the losses of the subsidiaries under the receivership, and on June 8, 1933, the amount of cash the receivers had on deposit was $37,231.40. While the Combustion Engineering Corporation's business was conducted with heavy losses, still the receivers had $449,187 in cash on June 8, 1933, but accounts payable as of May 31, 1933, were $471,000. They had notes and accounts receivable at the same time, after reserves, amounting to $325,683. Receipts from all sources, including accounts and notes receivable during 1933 to the end of May, have been at the average of about $140,000 per month, but disbursements during the same period were at an average rate of $160,000 per month.

The appellees' reorganization committee planned, on April 3, 1933, a reorganization for the corporations. Foster Wheeler Corporation had been negotiating for two years for the purchase of the property, and Mr. Bourne, originally a member of the reorganization committee, withdrew in order that he might be in a position to submit a plan. The plan of April 3, 1933, was submitted to the court for consideration, and the parties were directed to show cause why it should not be adopted. Hearings were had at which time the appellants appeared and sought and obtained adjournments for the consideration of the plan. On April 12th an order of sale was signed; on the 19th a hearing was had for the sale of the British company. On April 27th, the date fixed for the hearing and the approval of the plan and sale, the sale was adjourned upon request until May 9th, when the property was sold to a new corporation (organized by the reorganization committee) as the highest bidder, and the sale was confirmed, after a hearing on May 18th, by the court below, and a decree entered confirming the sale.

The plan of reorganization had the approval of the creditors' committee, but it was opposed by a preferred stockholders' committee, the appellants, Foster Wheeler Corporation, and two creditors. At the hearing on April 27, two other plans of reorganization were proposed, one by the preferred stockholders' committee and the other by Foster Wheeler Corporation. These plans were similar in many respects. All offered creditors of the parent company, the Combustion Engineering Corporation and another subsidiary securities or stock in varying percentages in place of their claims. None at first offered payments in cash to such creditors. The plan of the reorganization committee called for debentures to creditors as follows: To the parent company creditors, 80 per cent. of the principal amount of their claims; to the Combustion Engineering Corporation's creditors, 35 per cent.; to the creditors of the Heine Boiler Company, 50 per cent. The preferred stockholders' plan offered to the creditors of the parent company, 80 per cent. in first mortgage bonds or like security; to the creditors of the Combustion Engineering Corporation, 35 per cent. of such bonds; to the creditors of the Heine Boiler Company, 50 per cent. Foster Wheeler Corporation proposed the issuance to the creditors of a new preferred stock to be junior to $1,700,000 of outstanding Foster Wheeler Corporation first preferred stock which was then in default as to dividends. The second preferred stock was offered to creditors as follows: To the creditors of the parent company, 100 per cent. of the principal amount of their claims; to the creditors of the Combustion Engineering Corporation, 42 per cent.; to the credi-

tors of the Heine Boiler Company, 50 per cent.

All the plans recognized that the corporations were insolvent. Appellants supported the plans of the preferred stockholders' committee and the Foster Wheeler Corporation. But the plan of the preferred stockholders' committee and the offer of the Foster Wheeler Corporation were conditional on selling the stock of the British subsidiary for different amounts, at first $1,250,000 and later $1,000,000. The plan of the reorganization committee contemplated the retention of this stock or the proceeds thereof in the new company and also provided for raising $2,000,000 in new money which was underwritten by a banking firm. Later the plan of the preferred stockholders was withdrawn and offers supplemental to both the plan of April 3d and that of the Foster Wheeler Corporation provided for the payment of some cash to the assenting creditors.

The parties circulated the creditors and sought proxies, referred to as preference slips. When the hearing was had on April 27th before the court, the three alternative plans were considered. The court then pointed out the condition of the receivership and the need for a disposition of the property at an early date as essential. However, an adjournment was granted until May 9th, at which time the properties were offered for sale separately. No bids were received for separate parcels of the property of the parent company. The properties were then offered as an entirety. The reorganization committee bid $1,100,000 conditional only on getting possession in 20 days and on being the successful purchaser and obtaining possession of the assets of the Combustion Engineering Corporation within the same time. The Foster Wheeler Corporation bid an equal amount conditional upon being able to sell the stock of the British corporation for the amount of its bid. The court finally accepted the reorganization committee's bid, which was increased to $1,200,000 as the highest and best bid, subject to confirmation at a hearing on May 18th. All of the assets of the Combustion Engineering Corporation and its receivers were also offered for sale immediately after the sale of the parent company's assets. There was just one bid, the reorganization committee's of $800,000, which was accepted. Later both sales were confirmed.

At the time of the confirmation, 90 per cent. of the claims against the parent company and 80 per cent. of the claims against the Combustion Engineering Corporation had been deposited under the plan of the reorganization committee. At the confirmation, counsel for Foster Wheeler Corporation asked for 24 hours' additional time within which to obtain an offer for the sale of the British stock, but the court declined and confirmed and approved the sale and plan of the reorganization committee. No increase was made in the bid of the Foster Wheeler Corporation. It has not appealed from the decrees.

Thus there was a public sale with competitive bidding and the assets were sold to the highest bidder. No creditors are complaining, and over 94 per cent. have approved the sale under the reorganization committee's plan. In these respects the case differs from National Surety Co. v. Coriell, 289 U. S. 426, 53 S. Ct. 678, 77 L. Ed. 1300. In that case there was no public sale, and the court pointed out that the District Court undertook to pass upon the wisdom and fairness of the plan of reorganization and the rights of nonassenting creditors. But here the nonassenting creditors' rights were fixed as a result of the public sale and competitive bidding, and such creditors get their pro rata share of the amount bid after payment of the receivers' obligations and expenses. Here the properties of both companies were examined by competent engineers and a report made. Thorough audits were made at the outset of the receivership and continued throughout, and statements were available to the parties interested who might inquire. Authentic information was received as to what the property consisted of and details of its operation and its position at the time of the sale. While no appraisals were made by the court, still in a company as large as this, with competitive bidding, it is reasonable to assume that the best available price was secured. Surely, the parties negotiated long enough and may be expected to have examined with care and to have had full knowledge of the properties to be sold.

■■ It is said that the sale is invalid because an upset price was not fixed. If one were fixed, it would be included in the order of sale; otherwise prospective purchasers would not be informed as to the minimum bid requirements. But no one urged this before the court below as an objection. Moreover, the fixing of an upset price was discretionary. Palmer v. Bankers' Trust Co., 12 F.(2d) 747 (C. C. A. 8); Provident Life & Trust Co. v. Camden & T. Ry. Co., 177 F. 854 (C. C. A. 1). We find no abuse of discretion in this absence of an upset price. In Guaranty

Trust Co. v. Chicago, M. & St. P. Ry. Co. (D. C.) 15 F.(2d) 434, and in Equitable Trust Co. v. Western Pacific Ry. Co. (D. C.) 233 F. 335, reference is made to fixing an upset price as discretionary, and the court clearly recognized such discretion. We find nothing in the procedure leading up to or in the conduct of this sale which leads to the conclusion that the bids were not made in good faith and in competition thus obtaining the highest possible price.

█ Until the last twenty years, the courts, in no uncertain terms, expressed the view that they had no concern with the business of reorganization. Its sole function was, through its receivership and injunction, to hold the assets in statu quo pending either their sale or liquidation as the interested parties might determine. In latter years, it has been considered as within the court's jurisdiction to examine the proposed plan and to pass upon its fairness. Graselli Chemical Co. v. Ætna Explosives Co., 252 F. 456 (C. C. A. 2); St. Louis-San Francisco R. R. Co. v. McElvain (D. C.) 253 F. 123. It has the power to refuse approval of the sale by means of which the reorganization is to be effected, if it does not approve the plan. Swaine, "Reorganization of Corporations," 27 Col. Law Review, 901, 908.

█ It is argued that there was a chilling of the bids. The British subsidiary corporation was the International Combustion, Limited, the stock of which was owned by the parent company and pledged with the bank as collateral for receivers' certificates. A British firm bid for this property, offering $1,075,000 in cash. This offer contained a limitation to the effect that it must be accepted at a fixed time. It was, by an order to show cause, called to the court's attention, and on April 27th, after discussion, the court asked if there was any one in favor of the acceptance of this bid, and by common consent it was rejected. One of the grounds on which an adjournment was granted until May 9th was the prospect of the present appellants obtaining a higher bid for the English properties. On May 5th an agreement was entered into with the British interests by which it was agreed that, if and when the Superheater Company, an independent corporation, obtained the stock of the British subsidiary, it would sell it to the British firm for $1,075,000. It is not disputed that the negotiations leading up to this agreement were not commenced until after the British bid had been rejected in court on April 27th, and no fact is stated which indicates that the British firm might make a higher bid at a later sale. But it is stated that this agreement of May 5, 1933, destroyed a prospect that the appellants and the Foster Wheeler Corporation might be induced to increase their offers for the British company but for the suppressing of the bid of the British firm. This argument depends entirely upon the sole fact that an agreement was made as stated on May 5th. The bid of the Foster Wheeler Corporation was conditional upon selling the British firm for exactly the sum it bid, which meant that they would buy providing they secured the money to do so from the British firm. By selling to the British firm, the reorganization committee could protect its interests abroad and at the same time have additional working capital of $1,075,000. The agreement of May 5th assured the new company of satisfactory trade relationships and also of this working capital.

We find nothing to question the honesty of the motive leading to this agreement, and nothing was suppressed in its making. Apparently it was consummated as a sound business arrangement which each party conceived to be of advantage to itself. The court properly concluded that the agreement in no way improperly interfered with the sale to the reorganization committee. The Superheater Company's bid for the British company was conditional upon the property's coming to it; it left the Foster Wheeler Corporation in a position to make a bid upon a similar condition, and thus could not chill any bid of the Foster Wheeler Corporation. The bidding was not therefore curtailed.

The appellees were willing to take over all the property; the Foster Wheeler Corporation was not, and, since its conditions could not be met, the creditors and stockholders could not obtain the benefit of that plan.

██ Judicial sales may not be set aside for some inadequacy of price unless so great as to shock the conscience of the court, and the matter of affirmation is always within the sound discretion of the court. Speers Sand & Clay Works v. American Trust Co., 52 F.(2d) 831 (C. C. A. 4). We find nothing in this sale which justifies the charge of abuse of discretion.

█ Objection is made to the underwriting fee allowed to Hayden, Stone & Co. When the plan was submitted, because of the unsettled financial conditions, provision was made that the agreement to purchase the new securities should be underwritten by responsible bankers. According to the plan the firm of

Hayden, Stone & Co. were to receive 30,000 shares of the common stock of the purchaser, the new corporation, as compensation for underwriting the new securities. Of this amount 5,000 shares were to be distributed as compensation to members of various committees. But it was agreed that the Superheater Company, a sound corporation, would purchase the remaining 25,000 shares from the bankers for $25,000. This was disclosed to all the parties in interest. We think the court should have inquired into the necessity of this underwriting and the reasonableness of this fee of 25,000 shares, and should have fixed a proper fee or perhaps entirely eliminated this compensation. The court must be guided in such determination by ascertaining what would be a fair allowance for such services, and the cause will be remanded to the District Court for this determination.

The charge that there were violations of fiduciary obligations on the part of the reorganization committee or its counsel are without merit.

The decree is modified, and the cause remanded for consideration of the item of the shares of stock paid to Hayden, Stone & Co.; otherwise the decree is affirmed.

Decree modified.