**BOVAY et al. v. TOWNSEND.**

**No. 10173.**

Circuit Court of Appeals, Eighth Circuit.

June 12, 1935.

SANBORN, Circuit Judge, dissenting.

344

J. A. Tellier, of Little Rock, Ark., for appellants.

Max Frederick Goldberg, of Chicago, Ill. (Joseph W. House, of Little Rock, Ark., on the brief), for appellee.

Before GARDNER, SANBORN, and FARIS, Circuit Judges.

FARIS, Circuit Judge.

This is an appeal from an order of court confirming, over objection, the sale of two certain bridges, called in the record the Des Arc Bridge and the Powhatan Bridge, under a decree of foreclosure of a mortgage. Both bridges were owned by a single company, and were covered by the same mortgage and decree of foreclosure. They were situate in different counties, on different highways, crossed different rivers, and were some 85 miles apart.

Appellant Bovay is the holder of certain stock in, and a creditor of, the company which owned the bridges; other appellants together own some four bonds, par value $1,000 each, out of a total issue of $400,000, secured by the mortgage which was foreclosed. On a sale had in gross, both bridges were sold together for the sum of $50,000. They had cost to build about $463,000, including all outlay for construction costs.

Appellants objected to the confirmation of the sale on numerous grounds. Evidence was heard, and, being concluded, the court, as a conditon of approving the sale, ordered the successful bidder to increase the bid to $100,000, which, being done, the sale was approved and confirmed, and the objectors, now here as appellants, took this appeal.

The successful bidder was the reorganization promoters, consisting of the bond-holders' protective committee which had on deposit about 99 per cent. of all outstanding bonds, and which bought the bridges for the depositing bondholders, or a corporation organized by them, called the Des Arc & Powhatan Bridge Company.

On the hearing, or contest against confirmation, evidence of the fair value of the bridges varied from about $81,000 to about $350,000. The evidence disclosed that the gross annual income, less expenses of the two bridges over a period of four and three-quarter years, ran thus: 1928, $19,688; 1929, $37,571; 1930, $34,302; 1931, $17,562; 1932 (for nine months), $14,649, or at the rate of $17,532 for the whole year.

The yearly average of these earnings, over the five-year period, is thus found to be $25,351. If an annual depreciation of 2 per cent. (based on an assumed value merely of the bonds outstanding) be deducted, these average earnings will still be about $17,350. If this sum be capitalized on a 6 per cent. annual return to stockholders, it amounts to about $290,000, as the value of the bridges. Factors, affecting both the fat years and the lean years, were shown in evidence, touching whether the average annual earnings could or could not be maintained in the future. These dealt with the existing so-called depression, with the improvements of connecting highways, and the effect of competition with a new state-owned bridge over White river at Augusta, some 25 miles north of the Des Arc Bridge.

Appellants, as said already, filed objections to the confirmation of the sale. Later, they filed so-called intervening petitions as stockholder and bondholders, respectively, objecting to the confirmation of the sale, for that (a) the purchase price for which the re-organization managers of the bondholders' protective committee, called in the record the Des Arc & Powhatan Bridge Company, bid in the bridges, was grossly inadequate, as compared to the actual value of the bridges; (b) that the terms of the decree were unfair, onerous, and unduly burdensome to all potential bidders, except the Des Arc & Powhatan Bridge Company, in that a deposit of either $10,000, in cash, or $25,000 in bonds, was required to be put up, before any person could become a bidder; (c) that the order of sale of the two bridges as a unit, instead of selling them separately, was error; (d) that the actual sale of the bridges

was not had at the time or place advertised, but that it was had at the courtroom and without any advertisement whatever; and (e) no upset or minimum price was fixed by the court. Other objections, as that, in effect, the sale should not have been had during the existing so-called depression and that the bidder to whom the bridges were sold had not qualified as a lawful bidder under the terms of the decree and order of sale, need only mere mention, in the view we are constrained to take of the case.

It is also urged as error that the court erred in dismissing the several intervening petitions filed by appellants. But it is so obvious that these dismissals have nothing whatever to do with the merits of the appeal or with the questions now up for judgment that we merely mention the contention and pass it without discussion.

In discussing appellants' contention that the purchase price was so grossly inadequate that it was calculated to shock the conscience of a chancellor, we must, we think, on this point, consider only the price of $100,000, as fixed by the court as a condition of overruling the objections of appellants and confirming the sale. The simple situation is that appellants, being dissatisfied with the sufficiency in amount of this increase from $50,000 to $100,000, have nevertheless appealed, for this and other reasons.

■ Here the final bid at which the bridges were sold was about $19,000 more than the estimate of value fixed by a witness for appellee, and was as 1 is to 3.5, of the value fixed by a witness for appellants. Standing alone, it seems clear that there was no abuse of discretion, if that were all that is involved in the objections of the appellants, for the books are replete with cases wherein the discrepancy between actual value and purchase price is far greater than in the case at bar. Guaranty Trust Co. v. Chicago, etc., Ry. (D. C.) 15 F.(2d) 434; Central Trust & Savings Co. v. Chester, etc., Co., 9 Del. Ch. 123, 77 A. 771; Rospigliosi v. New Orleans, etc., R. Co. (C. C. A.) 237 F. 341; Simon v. New Orleans, T. & M. R. Co. (C. C. A.) 242 F. 62. Yet the sales were confirmed. On the other hand, there are many cases wherein the purchase price at a public judicial sale approximated one-half or three-fourths of the actual value. Wood v. Parker, 63 N. C. 379; Beaty v. Veon, 18 W. Va. 291; Sowards v. Pritchett, 37 Ill. 517; Kemp v.

Hein, 48 Wis. 32, 3 N. W. 831; Rosenham v. Pottinger, 60 S. W. 370, 22 Ky. Law Rep. 1290; Harlan v. Stout, 22 Ind. 488. Yet the sales were set aside. There were, however, in almost all of the cases last cited, other circumstances besides mere inadequacy of price, contributing to cause the setting aside of the sale.

The rule in the federal courts is quite well settled, however, that the matter of confirming a public judicial sale rests in the sound judicial discretion of the trial court and that appellate courts will not disturb that discretion, except in cases of its abuse. Pewabic Mining Co. v. Mason, 145 U. S. 349, 12 S. Ct. 887, 36 L. Ed. 732; Jacobsohn v. Larkey (C. C. A.) 245 F. 538, L. R. A. 1918C, 1176; Speers Sand & Clay Works v. American Trust Co. (C. C. A.) 52 F.(2d) 831, 835; Currin v. Nourse (C. C. A.) 66 F.(2d) 137; Bethlehem Steel Co. v. International, etc., Corp. (C. C. A.) 66 F.(2d) 409; 16 R. C. L. 95.

In the case of Speers Sand & Clay Works v. American Trust Co., supra, the rule was stated thus: "The rule is well settled that 'a judicial sale regularly made in the manner prescribed by law, upon due notice, and without fraud, unfairness, surprise or mistake, will not generally be set aside or refused confirmation on account of mere inadequacy of price, however great, unless the inadequacy is so gross as to shock the conscience and raise a presumption of fraud, unfairness, or mistake.'"

So, in view of the great variance in the evidence as to the value of the bridges, and in the light of the quoted rule, it cannot be said that there was such an inadequacy in the price last bid as to shock the conscience of a chancellor.

■ The contention urged by appellants that the terms of the sale, as fixed by the trial court, were unduly burdensome and favored the purchaser, and precluded other potential bidders, must likewise be disallowed. No bidder except the representatives of the bondholders' protective committee could, it is true, comply with the requirement to deposit $25,000 in bonds; but the alternative fixed was the deposit of $10,000, in cash. The requirement of a deposit, either in cash or bonds, prior to the sale of property under a decree of foreclosure, by any person who desires to bid, is usual and customary. This deposit is exacted, not only to cover costs of a second advertisement and sale, but also to

cover any possible deficit between the amount for which the property was struck off and sold on the first sale and the amount for which the property may be sold on the second sale. In our opinion, the requirement of the deposit of $10,000 in cash, as a guaranty of compliance in good faith on the part of a potential bidder, did not, under the facts here, constitute an abuse of discretion, for that it was too large. The matter again depends on the sound judicial discretion of the court nisi. Ketchum v. Duncan, 96 U. S. 659, 24 L. Ed. 868; Camden v. Mayhew, 129 U. S. 73, 9 S. Ct. 246, 32 L. Ed. 608; Revere Copper & Brass, Inc., v. Adriance Machine Works (C. C. A.) 68 F.(2d) 708. So we are of the opinion that this contention is not well taken.

■ Ordinarily, the matter of whether a sale should be in mass or by parcels, where the property is capable of being divided into parcels, is to be relegated to the court ordering the sale, and again it is a matter of sound judicial discretion. But this discretion may be abused. We are of the opinion, it was abused in this case. Here the bridges were some 85 miles distant from each other; they were on different highways, in different counties, and crossed different rivers. One obviously, on account of its location on a main highway between two large and important cities, was of far greater value than the other. Local pride of ownership may well have induced bidders to bid for one bridge, when such bidders would have had neither the financial ability to buy the other nor any desire to do so. In such a situation, it is the usual custom and the better practice to provide in the order of sale that the property, when fairly capable of division into lots, or units, shall first be sold in lots or units and then sold in mass, or contrariwise, and that the special master making the sale will accept that bid or that total of the bids which is the greater. So it is difficult to escape the conclusion that fairness was sacrificed, and all bidding chilled, except that of the Des Arc & Powhatan Bridge Company, by the requirement that the two bridges should be sold together.

■ The final contention to be noticed rests, we think, upon a federal statute and its necessary implications. It is contended that no authority exists for the action of the trial court in requiring, as a condition precedent to the approval and confirma-

tion of the sale, that the successful bidder at that sale should double its bid, as was here done. We are constrained to agree with this contention. The statute (section 847, tit. 28 USCA) provides as to sales made under orders and decrees of a court of the United States this: "All real estate or any interest in land sold under any order or decree of any United States court shall be sold at public sale at the courthouse of the county, parish, or city in which the property, or the greater part thereof, is located, or upon the premises, as the court rendering such order or decree of sale may direct."

We are impelled to the view that there was no authority under any statute or decision which warranted what was done in this case. The statute quoted requires that property under the situation here under inquiry "shall be sold at public sale at the courthouse of the county, parish, or city in which the property, or the greater part thereof, is located, or upon the premises, as the court * * * may direct." By section 849, tit. 28 USCA, provision is made for the publication of a notice or advertisement of sale in a newspaper for at least four weeks prior to the sale. Certainly it cannot be said that what was here done constituted compliance with the statutory provision as to place of sale absent as here, an order that it be sold in the courtroom or with the statutory provision requiring publication of a notice of sale. In effect, the trial court, convinced, as the implication and presumption clearly are, that the purchase price of $50,000 was unconscionably low, felt that the sale should not be confirmed; thereupon without notice or advertisement, as to time or place of sale, set the first sale aside and took but one bid, of a single bidder, to whom he sold both bridges.

We are of opinion that the sole power of the court lay in either approving and confirming the sale or in setting it aside and ordering another sale upon proper statutory notice. At least we find no warrant under the statutes quoted or in the ruled cases for what was here done. The rule is in effect so written in 16 R. C. L. 53. See, also, Cumberland Lumber Co. v. Tunis Lumber Co. (C. C. A.) 171 F. 352, 356; Ohio Life Ins. Co. v. Goodin, 10 Ohio St. 557. Construing the federal statute which provides the method of judicial sales, it was said in the Tunis Lumber Co. Case, supra, this: "The conclusion there-

fore seems to us to be irresistible that the intention of Congress was to confine sales of realty, when made by the orders or decrees of the federal courts, to one method, by public sale, as provided in the statute, and to divest the courts of the discretion which theretofore existed of making sales of such property otherwise. * * *"

The case of Blanks v. Farmers' Loan, etc., Co. (C. C. A.) 122 F. 849; Investment Registry, Ltd., v. Chicago, etc., Ry. Co. (C. C. A.) 212 F. 594; Miners' Bank v. Acker (C. C. A.) 66 F.(2d) 850; and Tracy on Corporate Foreclosure § 241, herein much relied on by appellee, are, we think, clearly distinguishable from the situation in the case at bar. As an example, Tracy says at page 241 this: "The court, instead of refusing to confirm and ordering a resale may *accept competitive bids* in open court." (Italics ours.)

It therefore may well be that, while full compliance with sections 847 and 849, supra, may sometimes be excused by reason of waiver and estoppel on the part of all persons interested and objecting to confirmation, those statutes yet must be observed, as a general rule of conduct.

We are of opinion that the trial court erred in causing the bridges to be sold in mass instead of as separate units, and in failing to order a resale, upon finding in effect that the bid of $50,000 was inadequate. These views dispose of the case, and no need exists to discuss other alleged errors.

It follows that the case must be reversed and remanded for further proceedings consistent with the views expressed in this opinion. And so it is ordered.

SANBORN, Circuit Judge (dissenting).

In my judgment, the opinion of this court in this case adopts too restricted a view of the discretion lodged in the District Courts in the conduct of judicial sales. Those courts, in ordering the sale of property, are faced with intensely practical problems, with which they are infinitely better equipped to deal than is this court. While their discretion is not unlimited, it should be broad enough to leave them free from interference by this court except where a clear abuse of discretion is shown and actual prejudice has resulted. Whether property to be sold under mortgage foreclosure can be more advantageously sold as a unit or in separate parcels is, in my judgment, a question for the lower courts to determine. In the absence of some showing that there were in existence persons who would have bid for the bridges separately or that there would have been some advantage in selling them separately, I see no justification for holding that there was an abuse of discretion in ordering a sale of the mortgaged property as a unit.

The purpose of the statute which requires the sale of real estate at public auction is to give all persons interested an opportunity to bid, to the end that the property may be sold to the best advantage. The public sale with which we are concerned demonstrated in a practical way that there was, at the time of the sale, only one person who would purchase the mortgaged property at a price as high as $50,000. Upon application for the confirmation of the sale, the court below was called upon to determine whether the offer made by this bidder should be accepted or rejected. Objections were made on the ground that the bid was inadequate. The court below, after a hearing, was of the opinion that the property should bring more than had been offered. It did not, however, find that the sale was collusive or fraudulent. It confirmed the sale on condition that the purchaser pay double the amount which it had bid. There was no showing that there were others who would or might pay more, and no evidence to justify a conclusion that, if another sale was ordered, other bidders would appear. The increased price was deemed by the court below to be adequate. The conditional confirmation of the sale was not prejudicial to the appellants. It resulted in their securing twice as much as they would have received had the sale been confirmed unconditionally. I think that there was no error committed by the court below in confirming this sale to the highest and only bidder, on condition that it increase the amount of its bid, nor in requiring that the mortgaged property be sold as a unit.

It is my conclusion that the order appealed from should be affirmed.