## Butler, *et al. v.* Watrous.

### *Bill to Enforce a Trust in Land.*

(Decided December 4, 1913. Rehearing denied February 5, 1914. 64 South. 346.)

1. *Judgment; Judicial Sales; Collateral Attack.*—Where to do so would be to attack the method pursued by a Federal court in making a judicial sale of land, the title thus acquired to said land cannot be questioned in a state court.

2. *Judicial Sales; Collateral Attack.*—Where the Federal court had jurisdiction, its judicial sale of land is not void, though not made in conformity to the Federal statutes requiring notice.

3. *Trusts; Action to Establish; Relief Granted.*—In an action to enforce constructive trust arising from an agreement to acquire land to be held jointly, the agreement also requiring one party to convey to the other a joint interest in lands owned by him, followed by the acquisition of title to the lands in one with the consent of the other, and ·a denial of the other's rights, it is proper for the court in granting relief to divest the party of an interest in the land which he already owned as such action did complete equity between the parties.

4. *Same; Constructive Trust; Evidence.*—While the mere breach of a parol agreement relating to land· does not avoid the application of the statute of frauds, and affords no basis for equitable relief, the fact of such breach may be looked to in determining whether fraud exists· which would raise a constructive trust.

5. *Same.*—In a bill to establish a constructive trust in lands, arising out of defendant's fraud, evidence of the acts of defendant after perpetrating the fraud is admissible.

6. *Same.*—The evidence examined and held sufficient to show fraud on the part of respondent to enforce a constructive trust in land.

7. *Same; Fraud.*—Where complainant and respondent entered into an agreement to acquire land for their joint benefit, and with fraudulent intent of denying complainant's rights, respondent obtained complainant's consent to the taking of title in the name of respondent. his fraud will impress a constructive trust on the land in his hands.

APPEAL from Shelby Chancery Court.

Heard before Hon. W. W. WHITESIDE.

Bill by J. L. Watrous against Albert N. Butler and others, to enforce a constructive trust in land. Decree for complainants and respondents appeal. Affirmed.

BARNES, DENSON & DENSON, and KOENIG & SLOCOMB, for appellant. Under the well understood definition of a resulting trust complainant is not entitled to have such a trust declared in his favor in the Howison land. —62 Ala. 129; 3 Pom. Eq. secs. 981, 1035-6-7; *B. & A. R. R. Co. v. L. & N. R. R. Co.,* 152 Ala. 422; *Watkins v. Carter,* 164 Ala. 456. The only ground upon which a constructive trust or a trust ex mala ficio can be rested and is rested, is actual, intentional fraud.—*Patton v. Beecher,* 62 Ala. 579; *Brock v. Brock,* 90 Ala. 86; *Smith v. Smith,* 153 Ala. 504; 3 Pom. sec. 1054-6. Equity does not pretend to enforce promises in the face of the statute, but endeavors to prevent and punish fraud by taking from the wrong-doer the fruits of the deceit.— *Patton v. Beecher, supra; Oden v. Lockwood,* 136 Ala. 514; *Butts v. Cooper,* 152 Ala. 375. Nothing but matters which occurred at the time of the giving of the order for the deed should be considered in determining whether a constructive trust can be worked out.—*Smith v. Smith,* 153 Ala. 504. Nothing outside of the written agreement will be regarded as sufficient to establish a trust enforceable in the courts.—*Oden v. Lockwood, supra;* 85 Pac. 477; 90 N. E. 920; 34 Atl. 809. There can be no fraud if a trust does not exist, and proof of its existence cannot be made by parol.—*Patton v. Beecher, supra.* The contract is not one susceptible of specific performance in a court of equity.—*Browning v. Kelly,* 124 Ala. 645. The chancellor erred in decreeing a half interest out of respondents and into complainants.—

*Dulen v. Hunter,* 98 Ala. 539; *Goodlett v. Hansel,* 66 Ala. 151. The respondent obtained no legal title to the land known as the Cary land, and therefore, could not do equity, as the judicial sale was not in accordance with the Federal statute.—Fed. 352; 26 U. S. 1.

STALLINGS & DRENNEN, for appellee. The case made by the bill and pleadings is that of constructive trust arising by fraud or otherwise.—1 Perry on Trusts, sec-27; *Samford v. Hamm,* 115 Ala. 206; *Deming v. Lee,* in MSS.; *Kent v. Dean,* 128 Ala. 609; *Manning v. Pippin,* 86 Ala. 357; *Martin v. Kelly,* 132 Ala. 201; *White v. Farley,* 81 Ala. 562; *Brock v. Brock,* 90 Ala. 86. Under these authorities it must be held that the court properly decreed the resulting trust in favor of appellee as against appellant.

McCLELLAN, J.—J. L. Watrous filed this bill against A. N. Butler, J. I. Butler, W. E. Crittenden, and the Montevallo Red Ash Coal Company, a corporation. As amended it sought to impress upon and enforce against certain lands, known in this litigation as the Howison lands, a trust in favor of Watrous. From the voluminous legal evidence noted on the submission, these conclusions of fact, after taking due account of the inconsistencies appearing in the evidence, must result:

(1) On January 7, 1909, Watrous owned 315 acres of coal-bearing land, known in this litigation as the Cary lands, and also certain claims, both arising out of or traceable to his purchase of assets of the Montevallo Coal & Railroad Company, a corporation.

(2) Adjoining the Cary lands were the Howison lands, carrying coal. On the date stated Watrous secured from Howison, for a nominal consideration, a

three months' option to buy the Howison lands at $15 cash.

(3) Because of the favorably appearing outcrop of coal on the Howison land, and the absence of any practically profitable way to enter, from the surface, the Cary land for coal-mining purposes, the Howison land bore a very important relation to the value of and the availability of the mineral underlying the Cary land. With the Howison land and the Cary land subject to a common interest and ownership, the basis for a promising prospective enterprise of that nature was to be found. The Howison land was, in consequence of this prospect, the key to the best value and development of the Cary land in respect of its mineral. Without the Howison land, the mineral under the Cary land was practically unavailable and unattractive to persons interested in mining operations.

(4) While this option was pending, Watrous discussed with A. N. Butler the former's prospects in respect of these coal properties. The two came from their homes in Connecticut to the properties, and viewed them as an entity; Butler being fully advised of the described important relation the Howison mineral lands bore to the Cary mineral lands.

(5) After Watrous had expended something over $100 in prospecting for coal on the Howison lands, Watrous and A. N. Butler made a verbal agreement to go in together, establishing a relation in the nature of partnership, to further test the Howison land for the coal outcrop indicated, to procure the extension of the option, and to share equally in the cost of the test, and, if the manifestation was confirmed by the test they were to make on the Howison land, Butler was to put up $15,000 to buy the Howison tract, and, with the Cary and Howison tracts as a basis, a corporation was

to be organized in which they should have equal stock; but, if the more extended test failed to justify the expectation, then each should bear the loss of one-half of the $1,500 required to be paid to Major Howison for the extension of the original option.

(7) In pursuance of this agreement the option was extended, but left, by its terms, to read in favor of Watrous, though Butler was recognized by him as being an equal beneficiary thereunder; Butler paying the $1,500 required. A considerable sum was expended *by them* on their *joint* account in driving a slope on the Howison tract, and materials, belonging to Watrous, suitable for that purpose, and of value, were moved from the Cary tract to the scene of operations on the Howison tract, and there used.

(8) Subsequent to the verbal agreement Watrous and Butler executed a paper (without date) in the following language: "Exhibit A. This understanding and agreement entered into by J. L. Watrous and A. N. Butler in regard to buying Howison land, and forming a company to operate same. A. N. Butler agrees to take up option on said land at $15,000. Watrous is to put into the proposed company all property now remaining to him which was formerly of the Montevallo Coal & Railroad Company, and to receive therefor stock and bonds to the same amount as said Butler shall receive for the Howison land, which is to be put into the proposed company. Butler and Watrous agree with each other that each will give the other one month's option to buy any or all his stock in proposed new company at lowest terms he will sell to any one. A. N. Butler. J. L. Watrous. Filed in office Feb. 13, 1911. J. R. White, Register."

They also executed the following written agreement indorsed on the back of the above-quoted instrument:

"J. L. Watrous hereby assigns to A. N. Butler one-half interest in all claims he may have against Mrs. Charles Cary and others, or against the Southern Mineral Land Co., or the Tennessee Coal & Iron Co., arising out of loss of land formerly held by the Montevallo Coal & R. R. Co., of Shelby county, Alabama, and said A. N. But ler hereby agrees to pay one-half of all costs arising out of any suits on said claims. A. N. Butler. J. L. Watrous."

(9) Consistently with the agreement, but before the extended option was availed of, the process of incorporation was effected by Watrous and Butler to the extent of fully preparing the papers therefor, except the omission of the name of the corporation therein, and of the filing of the papers in the appropriate office. The perfection of the incorporation was held up to settle upon a proper name, and, latterly, pending the possibility of a favorable, profitable sale of the common interest made by the combined Cary and Howison tracts, if the latter was bought under the option, or if such a sale was effected with the Howison tract represented by the right to buy it under the option.

(10) By subsequent agreement between Watrous (in whose name alone the extended option stood by its terms) and Butler, the conveyance under the option was to be made to Butler, who, as appears, was to furnish the $15,000 (less the $1,500 already paid to Howison) to effect the option. There is nothing about this agreement itself, or the agreement in connection with the established circumstances in relation to which it may be considered, to justify the conclusion, as of fact, that the, in nature, partnership arrangement was then intentionally abrogated or abandoned. The motive for Watrous' consent to the conveyance being made by Howison to Butler, when the extended option should be

availed of, appears to have been to pacify Butler, and to give him assurance that the payment by him to Howison of his money to effect the right raised by the extended option would be faithfully protected, and the engagement binding them would be carried out. It cannot be found as of fact, from this record, that Watrous contemplated, much less intended, the annulling of the agreement and the thereby unrequited sacrifice of his interests in the premises, to promote which he had shared, with Butler, his means, and in the process had fully uncovered to Butler his general hopes and plans, and therein had allowed Butler to become, as a practical matter, a coequal participant in prospects that appeared to them, after thorough investigation, flattering. Subsequent acts of these parties leave no room for doubt that there was no *mutual* purpose to abrogate the engagement, and thereby relegate them to a relation in the premises inconsistent with their joint enterprise.

(11) When the stated consenting of Watrous that the Howison conveyance might be made to A. N. Butler is considered in the light of preceding circumstances, and of the status of obligation and relation assumed by Watrous and A. N. Butler toward each other, *and in connection* with subsequent acts and conduct of A. N. Butler, and circumstances attending such acts and conduct, particular in respect of the availing of the option to buy the Howison tract, of the destruction by A. N. Butler of the incorporation papers prepared, at the instance of Watrous and A. N. Butler, by Mr. Leadbeater, and of the later preliminary processes to the creation by A. N. Butler with J. I. Butler (his brother), and W. E. Crittenden (his brother-in-law), of the respondent corporation, all as strongly colored by the fact that Watrous was not advised by A. N. Butler as fair candor and due recognition of their relation and the rights

of Watrous naturally required, lead to the conclusion that A. N. Butler entertained the purpose, when the stated consent of Watrous was thus innocently given, and manifestly later acted in accordance therewith, to defeat Watrous' right in the premises, and to avoid the obligations of his engagement with Watrous, and thereby secure (under the option) for his own free control and personal advantage the Howison tract.

(12) J. I. Butler and W. E. Crittenden are shown to have had notice of Watrous' relation to the Howison tract, and of the general object and effect of the agreement between Watrous and A. N. Butler with respect to the testing out of that tract, and of their engagement looking to the combining of the two tracts for their future joint advantage. Hence J. I. Butler and W. E. Crittenden cannot rely upon the doctrine that protects *innocent* purchasers for value.

The object of the bill has been stated. It is not a bill for specific performance, or one seeking vainly under settled doctrine to compel the organization of a corporation. The chancellor's conclusion established and directed the effectuation of the trust prayed. We concur with his view. If in divesting out of Watrous the title to an undivided half interest in the *Cary land*, and investing that in A. N. Butler, pursuant to the obligation to that end resting upon the respective parties under the engagements assumed by them, the error (if so) is without prejudice to appellants. That provision is so manifestly just, under the law and the facts as they prevailed to conclusions below, and as found here, it is not apprehended that A. N. Butler could desire the correction of the decree by the elimination of that feature of it—a feature that administers, with equity's customary completeness, full justice in the premises. Aside from this, however, our view is that Watrous' un-

qualified submission to the jurisdiction of the court afforded ample basis for the manifest equity the decree recognized and enforced with respect to the undivided half interest in the *Cary lands.* .

. The *evidence* in the case shows that Watrous was the owner in fee of the Cary lands. If his legal title to a minor part thereof—a 40—was in fact defective, appropriate point thereon should have been taken before the chancellor. The chancery court or this court cannot *review* the action of the District Court of the United States in respect of the *method* pursued thereby in the sale of the *Cary lands.* It had jurisdiction in the premises. The sale, if made without conformity to federal statutes requiring a particular character of notice, or method, of sale, is not void.—*Godchaux v. Morris,* 121 Fed. 482, 57 C. C. A. 434. See, also, *Pewabic Mining Co. v. Mason,* 145 U. S. 349, 12 Sup. Ct. 887, 36 L. Ed. 732; *Nevada Syndicate v. National Co.* (C. C.) 103 Fed. 391.

Assuming for the occasion only that no express trust and no basis for the implication of a *resulting* trust are shown by this record, no doubt is entertained, under the facts inducing the conclusions stated before, that a *constructive* trust was established in favor of the complainant. And in reaching this conclusion we have not been unmindful of the rule, stated in many deliverances here, that a mere breach of parol promise does not alone suffice to avert the application of the statute of frauds, and alone gives no basis for the invocation of equity to relieve or vindicate in the premises. But nevertheless "the fact of such breach," as said in *Brock v. Brock,* 90 Ala. 93, 8 South. 13, 9 L. R. A. 287, "may, of course, be looked to, in connection with the other circumstances of the case, as sometimes constituting one of several links in a chain of facts going to prove

fraud." *Subsequent* acts, conduct, or dealings by A. N. Butler "may be looked to as aid in determining what her (his) intention was when she (he) obtained" the consent of Watrous that Howison might make the conveyance to Butler. If fraud, as has been found from the whole evidence, affected his intention, it vitiates "the transaction, and remits the complainant to the rights he had before the" agreement for such conveyance by Howison was made. And in such case equity will declare Butler a trustee ex male-ficio, and divest the title to a moiety for the fraud in acquiring it.—*Manning v. Pippen,* 86 Ala. 364, 5 South. 572, 11 Am. St. Rep. 46.

This broad doctrine, Pomeroy's statement of which is quoted approvingly in *Kent v. Dean,* 128 Ala. 609, 610, 30 South. 546, is controlling upon the conclusions of fact necessarily resulting from the evidence: "Whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentation, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other siimlar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property in the hands of the original wrong-doer or in the hands of a subsequent holder, until a purchaser of it in good faith, and without notice, acquires a higher right, and takes the property relieved of the trust."

If the only other evidence in this record bearing upon the issue of fraud vel non, in the securing by Butler of

Watrous' consent that the deed, under the option, might be made to Butler, was the naked fact of Watrous' consent thereto, the argument would doubtless be persuasive. But the securing, under the circumstances shown, of that consent cannot be dissociated from the many elucidating facts and circumstances that give color and effect to that act. The relation of trust in the premises between Watrous and A. N. Butler, created by the nature of their negotiations leading up to obligations assumed by them toward each other, and the engagement itself required of each the highest good faith, the utmost fidelity. Upon the face of these obligations each gave and took valuable considerations and rights, and subjected themselves to correlative duties that equity cannot ignore or conscionably avoid. Watrous no more than Butler could, with fraudulent intent, establish *independent* rights in the subject-matter of their joint enterprise. When Butler received the title to the Howison land, consistent with Watrous' consent that it might be transmitted to him alone, that land was still impressed with the highly equitable obligation and trust which the chancery court has established. This consent, as the whole evidence clearly shows, was entirely without the purpose of Watrous to sever the basis of the joint enterprise—the community of prospect and operation that a common ownership of both the *Cary* and *Howison* lands inspired, and with reference to which they each, with the clearest of intention, engaged and parted with values. It is impossible under this evidence to conclude that Watrous, in so consenting, even remotely contemplated the complete destruction of all basis for the enterprise that, under the evidence, was at least a matter of pleasing prospect—an enterprise that had induced their accord and invited their joint outlay in time, attention, and values. Butler did not

intimate or express, in advance or at the time Watrous' said consent was given, an intent or purpose to that end on his part. If his desire and intent to establish in himself an *independent* relation to the Howison lands prevailed, the obvious effect would have been to attribute to Watrous the wholly unrequited surrender of what, under this evidence, was the only practical means to the development of his Cary lands, as well as the loss of what had been contributed by him, and also the, to him, manifestly valuable option to buy the Howison lands.

The decree enforces manifest equity between the parties under established equitable principles. It is affirmed.

Affirmed.

MAYIELD, SAYRE, and SOMERVILLE, JJ., concur.

