## BALTIMORE TRUST CO. v. INTER-OCEAN OIL CO.

### No. 2055.

District Court, D. Maryland.

Sept. 16, 1939.

Karl F. Steinman and Carlyle Barton, both of Baltimore, Md., for American Trading & Production Co.

J. Cookman Boyd, Jr., and G. Ridgely Sappington, both of Baltimore, Md., special master.

Hunter Moss and Venable, Baetjer & Howard, all of Baltimore, Md., for Richfield Oil Co.

CHESNUT, District Judge.

The question for present decision in this case is whether the recent judicial sale of the real estate of the Interocean Oil Company shall be confirmed or set aside on the ground of inadequacy of price. To more clearly understand the question presented a brief historical statement will be helpful.

The case was originally brought early in 1932 by the Baltimore Trust Company as Trustee under deed of trust from the Interocean Oil Company securing an issue of $2,000,000 of bonds, to foreclose the deed of trust and sell the property, and in the meantime to have a receiver appointed. By consent of the parties Joseph P. Connor was then appointed receiver, and more recently as special master to sell the property. In the meantime he has operated it as fully as possible, receiving some income and paying necessary expenses. The property consists of about one hundred acres of land at Curtis Bay, Maryland, with 1800 feet of good water front. It has been used principally for the storage of oil products. During seven years of operations gross receipts of about $125,000 have just about equalled the expenses of operation, excluding taxes accruing at the rate of about $10,000 a year, of which amount about $5,000 has recently been paid from the receiver's income and some portion from capital assets.

None of the parties to the case desired an early sale of the property by reason of the depressed value of real estate, and no steps were taken by them to have a sale made until finally the court in 1937 on its initiative indicated to counsel that the case should be brought to a close, and thereupon, on petition of the receiver formally bringing the matter before the court, a sale was ordered and held in January, 1938, an upset price being fixed at $250,000. The property was not then sold, the highest bid for the property as an entirety being about $51,000. After further efforts were made by the receiver to effect a private sale, the court again, early in 1939, indicated that the case should be closed in some way by sale or otherwise; and thereupon on further petition another public sale was ordered without an upset price being named, at which the highest bid was $100,000, made by the American Production and Trading Corporation. Exceptions to the confirmation of the sale were filed by several bondholders on the ground of gross inadequacy of price and a hearing on these exceptions was held before Judge Coleman on July 6, 1939. After hearing some evidence deemed inconclusive, Judge Coleman postponed further consideration of the matter until it could be taken up by the writer of this opinion who had previously been judicially supervising the case. In an oral opinion Judge Coleman indicated that he felt there should be further testimony in the case as to the fair value of the property, and suggested the desirability of having an appraisal made by a disinterested real estate expert familiar with the value of this class of property. He said:

"I do think that there is a prima facie gross discrepancy between what appears to be the probable value, even in a forced sale, of this property, and what was actually offered for it. * * * As an original proposition to me, I think there is probably

sufficient discrepancy between what would appear to be a fair value in this property and what has been offered to warrant a court of equity in declining to ratify the sale. But that statement is made with reservation."

Shortly thereafter by conference with and agreement of counsel, a further hearing in the matter was set for September 14, 1939; publication by notice and otherwise was given to the parties in interest that at the hearing further testimony might be submitted by any party in interest on the question of value, and if the sale should be set aside the court would also consider written propositions submitted by bondholders on or before September 1, 1939 for a practical disposition of the case; and on failure of this, then the parties should show cause why the case should not be dismissed for want of prosecution. This hearing has now been held and additional evidence on value has been submitted.

On the question of fair value of the property, there is the testimony of Mr. Harry E. Gilbert, admittedly a competent real estate expert, who was engaged by the receiver upon the suggestion of the court to appraise the property, that in his opinion its fair market value, both as of the date of public offering for sale and of the present time, for land and improvements, is $250,000. One of the bondholders in excepting to the sale stated that at the hearing she would have submitted to the court an offer of $155,000 for the property; and under date of August 31, 1939, this offer was made by the Richfield Oil Corporation which has delivered its certified check for that amount payable to the order of the special master. Counsel for the purchaser, the American Production & Trading Company, in support of its bid of $100,000, has offered no expert opinion or other oral testimony bearing on the fair value of the property, but calls attention to the fact that the property has for seven years been operated at a large loss and the improvements and equipment on the property must have deteriorated in value in recent years. He has also offered the public tax assessments on the property for the years 1924 to 1939 respectively. These show that in 1924 the land and improvements were valued at less than $100,000 but that thereafter the assessments were greatly increased, and in 1931 and 1932, were nearly $300,000 and for 1938 the assessment was $397,000 and for 1939, $307,-000. These assessments were made for 1938 and 1939 despite the efforts of the receiver to have them materially reduced, in petitions to the City Bureau of Tax Assessments, stating a requested valuation of $150,000 on land and improvements. The receiver also personally testified that as of June 6, 1939 (the date of the public offering for sale) it was his opinion that the property was fairly worth from $200,-000 to $225,000, for the land and improvements. The receiver had been the plant manager of the property for many years prior to the receivership, although not charged with its financial management until he was appointed receiver.

There was also stated at the hearing some former history of the property by Mr. J. Cookman Boyd, Sr., who had long been familiar with it, and now still represents bondholders to the amount of about $500,-000. Mr. Boyd's statement, not controverted although not given as a witness under oath, was that on behalf of the owners of the property in 1925 he had negotiated, or at least was familiar with, the sale of the property to the newly organized Interocean Oil Company of Delaware, for a price of about $1,500,000 in cash and about $400,000 of bonds thereof issued to his clients and still now outstanding.

The contention of counsel for the purchaser is that, irrespective of the present fair value the sale was fairly made, and that inadequacy of price is not sufficient to set the sale aside. He also says that the question is to be considered on the basis of the fair value as of June 6th, unaffected by subsequent developments and prospective valuation based on the very recent outbreak of the war in Europe. It will be noted, however, that the testimony as to the fair value in this case is related to the time of the public sale unaffected by subsequent happenings.

The question for decision thus comes to this; where real property is shown to be fairly worth $225,000 to $250,000, and the bid therefor is only $100,000 and there is a subsequent bid, before confirmation of the sale, for $155,000, should the court refuse confirmation of the sale to the highest bidder ($100,000) on the ground of gross inadequacy of price, and re-open the bidding, or is the purchaser entitled as a matter of law to have the sale confirmed because there was no irregularity or other unfairness in the making of the sale.

The most recent statement of the applicable law in this Circuit is found in an opinion by Judge Parker, Speers Sand & Clay Works v. American Trust Co., 4 Cir., 52 F.2d 831, 835, reading as follows:

"The rule is well settled that 'a judicial sale regularly made in the manner prescribed by law upon due notice, and without fraud, unfairness, surprise or mistake, will not *generally* be set aside or refused confirmation on account of mere inadequacy of price, however great, unless the inadequacy is so gross as to shock the conscience and raise a presumption of fraud, unfairness, or mistake.' 16 R.C.L. 95; Pewabic Mining Co. v. Mason, 145 U.S. 349, 12 S. Ct. 887, 36 L.Ed. 732; Everett v. Forst, 50 App.D.C. 215, 269 F. 867, 15 A.L.R. 789. And it is equally well settled that whether the price bid is grossly inadequate and whether and upon what grounds confirmation should be refused are matters within the judgment and *discretion* of the tribunal ordering the sale, with the exercise of which an appellate tribunal will not interfere except in cases of abuse. Jacobsohn v. Larkey [3 Cir.], 245 F. 538, L.R.A. 1918C, 1176. From the facts stated, it is clear that there was no abuse of discretion by the court below." (Italics supplied)

See, also, Ballentyne v. Smith, 205 U. S. 285, 27 S.Ct. 527, 51 L.Ed. 803; Bovay v. Townsend, 8 Cir., 78 F.2d 343; 35 C.J. 101, 102; Clark on Receivers, Vol. I, ss. 517, 518; 11 A.L.R. 399; 71 A.L.R. 674.

It will be noted in the Speers case that the determination, whether the price bid is so grossly inadequate as to justify refusal of confirmation of the sale, must largely be left to the sound judicial discretion of the trial judge. In this connection it is noted that in 52 F.2d on page 834 of the opinion in the case, it was also said:

"The question as to whether the sale should be confirmed was a matter resting in his sound discretion; and certainly, in the light of this evidence, we cannot say that there was an abuse of discretion in confirming it."

And again in 52 F.2d on page 835, it was said:

"These considerations, however, merely go to the general equities. We base our decision, not on them, but upon the uncontradicted testimony at the hearing to the effect that the price was not grossly inadequate, upon the fact that the sale was openly and fairly conducted after full advertisement, and *upon the fact that no raised bid has been offered for the property.*" (Italics supplied)

Although there is no evidence of irregularity or unfairness in the sale, there are some other considerations in this whole case to be borne in mind in the exercise of the court's discretion. The bondholders as a class have throughout been reluctant to have the property sold. They have apparently been actuated by the fact that, some years ago at least, this property was considered of large value and fair security (together with some other included property—although this Baltimore property was the main item) for a bond issue of $2,000,-000, of which amount $1,850,000 are still outstanding. They have perhaps naturally been reluctant to face the realities of changed economic conditions affecting the property. Furthermore, as explained in the testimony of Mr. J. Cookman Boyd, Jr., a large portion of the bonds, probably a majority outstanding, are held by liquidating corporations or by trustees who are not in a position to make further investments to protect their holdings. The public sales in 1938 and 1939 were brought about largely on the initiative of the court because, after holding the property for six or seven years, in the meantime with an accumulation of taxes to the amount of about $70,000, it seemed highly desirable to bring the case to a close. It also appears that if the sale for $100,000 is confirmed, with a necessary adjustment of taxes and other expenses, there would be probably, as a rough estimate, a dividend to bondholders of about two per cent. only on their bonds. If the property can be sold for even so little as $155,000, this dividend would probably amount to 5%. It is obvious that the bondholders are necessarily taking a very great loss on their investment, and there is at least some equity in their position that their property should not be sold away from them for $100,000 when there is a firm cash offer in the amount of $155,000. No doubt the court would be justified, in view of the prior long continuation of the case, to now dismiss it for want of prosecution by the plaintiff; but this course would be disadvantageous to the bondholders because there are a large number of unsecured creditors and it is likely that another receivership would promptly follow with another judicial sale, or possibly a sale for unpaid taxes.

It is also to be noted that the confirmation of the sale is not being requested or

urged on behalf of the lien or other creditors desiring satisfaction of their debt, but has been made primarily for liquidation and as apparently the best practicable method of terminating a long continued equity receivership. The only party pressing for a confirmation of the sale is the highest bidder thereat.

I reach the conclusion after a consideration of the evidence, that the sum of $100,000 is grossly inadequate as compared with the fair value of the property. And irrespective of the advanced bid of $155,000, I would have no hesitation in setting the sale aside on that ground alone, if the situation with regard to the case as a whole were such that it would be reasonable to continue the receivership without a sale. In this connection it is to be noted that one of the bondholders representing about $200,000 par value of bonds, in response to the order of court as to the scope of the hearing, has submitted a tentative plan for taking the case out of receivership by supplying sufficient additional money to pay accumulated and unpaid taxes and expenses of receivership. But it is apparent that the plan is very tentative, would probably require a separate bankruptcy reorganization case under chapter 10 of the recent Chandler Act, 11 U.S.C.A. § 501 et seq., and is uncertain as to result.

In my opinion even the advanced bid of $155,000 is still an insufficient price for the property, but the stated position of all the bondholders at the hearing, a large majority of the outstanding bonds being represented, was that they preferred to accept the figure of $155,000 for the property, if that should remain the highest bid, rather than pursue other tentative plans for reorganization; but they nevertheless earnestly oppose the confirmation of the sale for $100,000 on the ground that it is grossly inadequate.

It is true that the earlier English practice, now abolished by statute, in accordance with which bidding at a public sale was automatically re-opened where there was an increased bid to the extent of 10%, has not been adopted in federal equity practice, nor in probably the majority of the States, but nevertheless there are very many cases in which it has been permitted in federal equity practice where, before confirmation of a sale, the advanced bid has been in an amount very considerably in excess of the highest bid at the public

sale. In such cases the view is taken that the greatly advanced bid, in the absence of circumstances indicating the contrary, is indicative of such a grossly inadequate price as would justify refusal of confirmation of the highest bid at the public sale. In a number of cases an advanced bid of even 20% has been held sufficient to justify re-opening of the bidding. Here the advanced bid is 55% more than the highest bid at the sale. Illustrative cases in federal equity practice are Shipe v. Consumers Service, 7 Cir., 29 F.2d 321, 322 (where in the opinion it was said: "But when, as here, the advanced offer before confirmation is nearly 20 per cent. of the price bid, we could not say that the court's discretion was abused in making it possible again to offer the property at this increased upset price."); Everett v. Forst, 50 App.D.C. 215, 269 F. 867, 15 A.L.R. 789 (where the advanced bid again was an increase of 20%), sub. nom. Tudor v. Schindler, certiorari denied, 279 U.S. 850, 49 S.Ct. 347, 73 L.Ed. 993; Morrison v. Burnette, 8 Cir., 154 F. 617; Blanks v. Farmers' Loan & Trust Co., 5 Cir., 122 F. 849 (where again the advanced bid was 20% greater than the price bid); Investment Registry v. Chicago & M. E. R. Co., 7 Cir., 212 F. 594; Blackburn v. Selma R. Co., C.C., 3 F. 689; Heller v. Lamar, 64 App.D.C. 266, 77 F.2d 389. See, also, cases annotated in 11 A.L.R. 399 and 71 A.L.R. 674. The English practice apparently still prevails in North Carolina and some few other jurisdictions. Attorney General v. Roanoke Navigation Co., 86 N.C. 408; Blue v. Blue, 79 N.C. 69.

While the re-opening of the bidding on judicial sales, excepted to for inadequacy of price and accompanied by an advanced bid, has not been a frequent practice in this court, there are instances in which it has been permitted. In my opinion it should be allowed in this case; but of course in re-opening the bidding an opportunity must be given to the purchaser, the American Production & Trading Co., to submit a further bid if desired, and like opportunity to other bidders if there are any others interested to do so.

The rule of equity practice that judicial sales fairly made by a master, receiver, or other officer of the court, should generally be confirmed as against objection merely on the ground of inadequacy of price, is a rule of policy rather than one of absolute law. In the ordinary

case, where the objection based on inadequacy of price is not supported by a very substantial higher bid, it is unwise to refuse confirmation because such a general policy if adopted would discourage or chill bidding at judicial sales generally. But where the advanced bid is very much greater than the highest bid at the sale, considerations of the equities of the owners of the property have generally been held to outweigh that of the purchaser at the sale, because of course the court owes the duty to the property owners to obtain for them the highest possible price for their property and a mere rule of policy in promoting the efficiency of judicial administration in the matter of sales, ought not to outweigh consideration for the property owner in such cases. This was well expressed by Circuit Judge Sanborn in Morrison v. Burnette, supra, as follows in 154 F. at page 623:

"Nevertheless he buys subject to the confirmation or avoidance of the sale by the court, and as he is aware of this fact, and the court is selling the property of others, and is acting in the dual capacity of trustee for the owners and of a judicial tribunal, it is undoubtedly its duty until confirmation to exercise a wise judicial discretion to secure for the owners the largest price consistent with a just regard for the rights of the bidder. Hence, if a material advance in price is offered and secured by a deposit or by a bond before the sale is confirmed, the sale has sometimes been opened, further bids have been received, and a sale to the highest bidder has been confirmed."

■ Where the sale has been fairly made and is not confirmed to the highest bidder, it is, however, equitable to reimburse him from the proceeds of the sale to the extent of his necessary and· reasonable expenses, such as, for instance, cost of title examination; and this will be done in this case upon proper request therefor.

■ It was suggested by counsel for the purchaser that· the Maryland decisions on this point should be controlling in view of the recent decision of the Supreme Court in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. We are, however, dealing here with a matter of federal equity practice rather than a rule of substantive law either in law or equity cases. But apart from this, I find no material difference between the Maryland and federal equity practice on this subject. See Boyd v. Smith, 127 Md. 359, 365, 96 A. 526; Weinstein v. Boyd, 136 Md. 227, 234, 110 A. 506; Shirk v. Soper, 144 Md. 269, 276, 124 A. 911.

 I conclude, therefore, that the bid of $100,000 by the purchaser at the public sale should not be confirmed; but that the bidding should be re-opened and the bid of the Richfield Oil Corporation of $155,000 should be considered, with leave to the purchaser at the sale, the American Production & Trading Co., and others who may be interested, to submit other bids for the property. The case will therefore be re-opened for this purpose on Wednesday, September 20, 1939, at 10 o'clock A. M., and counsel for the parties will be at once notified thereof by the clerk.