## HARRELL v. PRAIRIE OIL & GAS CO.

(Circuit Court of Appeals, Eighth Circuit. September 14, 1925. Rehearing Denied December 2, 1925.)

No. 6817.

**1. Guardian and ward ⬅113—Evidence held insufficient to establish grossly inadequate consideration for oil lease.**

Evidence *held* insufficient to establish grossly inadequate consideration for oil lease, given under direction of probate court.

**2. Guardian and ward ⬅113—Inadequacy of consideration alone not grounds for cancellation of oil lease sold under order of court.**

Inadequacy of price is not alone grounds for cancellation of oil lease, sale of which was under direction of, and confirmed by, probate court having plenary jurisdiction.

**3. Guardian and ward ⬅113—Fraud in effecting judicial sale of oil lease held not shown.**

That guardian's petition for order to sell oil lease and notice of sale did not disclose fact property was then producing, and fact that petition was prepared for guardian by intended purchasers, *held* not to show fraud in effecting sale.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Suit by Mary Harrell, by her next friend, Zora C. Lannom, against the Prairie Oil & Gas Company. Decree for defendant, and plaintiff appeals. Affirmed.

John J. Shea, of Tulsa, Okl., and A. F. Vandeventer, of Bartlesville, Okl., for appellant.

J. L. Hull, of Muskogee, Okl. (T. J. Flannelly and Paul B. Mason, both of Independence, Kan., and N. A. Gibson and T. L. Gibson, both of Muskogee, Okl., on the brief), for appellee.

Before LEWIS, Circuit Judge, and VAN VALKENBURGH and FARIS, District Judges.

LEWIS, Circuit Judge. In July, 1922, appellant, a non compos Cherokee Indian, brought this suit, by her sister and next friend, in the district court of Washington County, Oklahoma, seeking therein a decree of cancellation of an oil and gas lease given to appellee on June 19, 1916, by her guardian. The complaint disclosed that the guardian gave the lease after proceedings had been taken for that purpose in the probate court having charge of the ward's estate, and that an order of that court was entered on June 19, 1916, confirming the giving of the lease; but it was alleged as ground for the relief sought that at the time the probate proceedings were had appellee then held an oil and gas lease on the 80 acres belonging to the ward which would not expire until three years and nine months thereafter, and that the whole proceeding (in probate) was vague, indefinite, misleading and fraudulent (a) in that it failed to state either in the petition of the guardian to sell the new lease, or in the order authorizing its sale, or in the notice of sale, whether the proposed lease would take effect immediately upon its approval by the court or at the end of the term of the then existing lease; (b) that the purpose of the sale and lease was fraudulent because the existing lease would be a cloud upon the title of any bidder other than appellee, and a lease to anyone else would not become effective until the expiration of the old lease, thus preventing competitive bidding; (c) that the proceedings were fraudulent in that the notice of the proposed giving of a new lease did not state that the lands then had producing wells thereon; (d) they were fraudulent in that the notice failed to state that the wells on the lands were fully equipped with casing and the value thereof, and that said casing would be sold and become the property of the new lessee; (e) in that the form of notice was the one usually used where oil and gas mining leases are advertised for sale on undrilled and unproductive lands; (f) in that at the time the lease was sold the wells on the land were producing from what is known as the Bartlesville sand and that wells in that vicinity had a fixed market value of not less than $2,500 per barrel per daily production, and (g) because of the foregoing facts there was no competitive bidding and appellee, on its bid of $1,000, thereby obtained an unjust and unlawful advantage over the ward, the said lease being worth not less than $75,000, in addition to the royalties reserved. The 80 acres belonging to the ward was allotted to her under the Act of July 1, 1902. The first lease was given to Renfrow Oil & Gas Company on February 2, 1905, for a term of 15 years from its date, and was assigned to appellee in 1912. The second was given for a term of 5 years from its date, June 19, 1916, and for as much longer thereafter as oil or gas should be found in paying quantities. These facts are disclosed by exhibits attached to the complaint.

The suit was removed to the Federal court. By its answer appellee admitted that it was assignee of the old lease and had been in possession under it, that the ward's guardian gave to it a new lease on the 80 acres on June 19, 1916, after procedure had been tak-

en in probate court for that purpose, as alleged in the complaint, but it denied that those proceedings were fraudulent, unlawful, or misleading or intended so to be in any respect, denied that its bid and purchase price, $1,000, for the lease was inadequate, alleged that all of the facts and circumstances regarding the condition of the 80 acres and sale of the lease were fully disclosed to the probate court, that the court was fully advised as to all of the facts, that the subject-matter thereof was wholly within its jurisdiction, and its order confirming the lease is not subject to collateral attack.

The guardian's petition to sell the new lease was filed in probate court June 7, 1916. Among other things it stated that the 80-acre tract had been leased for oil and gas on February 2, 1905, to the Renfrow Oil & Gas Company, that said lease ran for a period of fifteen years from February 2, 1905, that it had been assigned and transferred to the Prairie Oil & Gas Company, appellee, and that company was in possession producing oil and gas, that the guardian had received from appellee an offer for a new lease to be substituted for and taken in lieu of the old lease, such new lease to extend for a period of five years and so long thereafter as oil or gas may be found in paying quantities, that appellee had offered to pay the guardian as a bonus for said new lease the sum of $1,000 and to pay a royalty of one-eighth of the oil to be produced. The petition prayed that the guardian be authorized by order of court to lease the land for oil and gas mining purposes for the term of 5 years and as much longer thereafter as oil or gas is found in paying quantities, and that said lease be sold in accordance with law and with the rules providing therefor. The court entered an order on the petition that the guardian offer for sale an oil and gas mining lease for the term of five years and as much longer thereafter as oil or gas is found in paying quantites on the 80 acres. The order then contains this:

"It is further ordered that the said sale be for a cash bonus of not less than $1,000.00 and a royalty of not less than one-eighth of all the oil produced and saved from the premises or its equivalent in money at the market value thereof * * * that the sale of said lease be held in the court room occupied by this court in open court on the 19th day of June, 1916."

It was further ordered that notice of the sale be given by posting and by publication, and that such sale should be in all things subject to confirmation, acceptance and approval of the guardian and of the court. The notice was posted and published by the guardian as ordered. It recited that the petition of the guardian for sale of an oil and gas mining lease for a period of five years and as long thereafter as oil or gas is produced in paying quantities on the lands of his ward had been filed in said court. The land was described in the petition and notice by legal subdivisions and by naming the county in which it was situate. The notice further stated that hearing on the petition had been set for June 19, 1916, and the court would hear the same at that time. It further recited:

"Notice is further given that said lease will be offered for sale at said time and place, at which time all persons interested may appear and submit bids thereon, and that said lease will be sold to the highest and best bidder, subject to the confirmation of said court. The right to reject any and all bids is hereby reserved."

It was signed by the guardian. Proof of publication and posting of the notice was duly made. On June 19, 1916, the guardian filed with the court his report, stating that on that day he had sold in open court, in accordance with the prior order of the court, an oil and gas lease on the land of his ward, naming her and describing the land, 80 acres, to the Prairie Oil & Gas Company for a cash bonus of $1,000, and in addition thereto a royalty of one-eighth of the oil to be produced and saved from the premises, or its equivalent in money, and the sum of $150 per year for each gas well from which gas would be marketed, for the term of five years and as much longer thereafter as oil or gas is produced in paying quantities. On the same day the court entered an order reciting that the matter came on for hearing on the return and report of the guardian, and it was ordered that the report be approved and the guardian directed to deliver the lease. All of the preceding steps that had been taken were recited, including the terms of the lease to be made and the price for which it had been sold. It was found that the Prairie Oil & Gas Company was the highest and best bidder for the lease, that the sale was made and conducted fairly and legally in accordance with the order of court, that a greater sum than that bid by the appellee, $1,000, could not be obtained and that it was to the best interests of the ward that the bid be accepted and the lease be made, and that notice of the sale had been given as directed. It was recited that the court had examined the proposed lease and it was there-

upon confirmed and approved and the guardian directed to execute it. The guardian then reported that he had executed the lease in compliance with the order of court, attached to his report a copy of the same and asked an approval order, and an order was entered approving that report.

Under the old lease seven wells had been put down on the tract, the last in 1909, two of which were dry holes. Offset wells at the north end of the eighty and near to the center of its east side line were also dry. The five wells had a total average daily production as follows: In 1913, 20 barrels; in 1914, 18 barrels; in 1915, 19 barrels, and during the first six months of 1916, 26 barrels. There was uncontradicted testimony from a witness thoroughly experienced in the development of oil lands and familiar with conditions on the 80 acres under the old lease, that the dry holes on the eighty and on land contiguous to it condemned it as unfavorable for further development and as not being a profitable proposition to drill, that everything which prudent development called for under the old lease had been drilled. The proof showed the amount of oil produced under the old lease for the years 1913, 1914, 1915 and the first six months in 1916, and under the new lease during the remaining six months of 1916 down to January 31, 1924, for each year. During the 3½ years under the old lease the gross in barrels produced was 25,599.44, and the royalties paid during that time amounted to $3,076.19. During that time the value of oil produced prior to January 1, 1916, averaged less than $1.00 per barrel, and during the first half of 1916 its average value was $1.45 per barrel. It continued thereafter under the new lease to be of an average value of more than $1.00 per barrel, and in 1920 was more than $3.00 per barrel, but in January, 1924, its value was down to slightly more than $1.00. No gas was utilized under the old lease and therefore no royalties were paid for gas, nor was any gas utilized under the new lease until 1918. During that or the preceding year appliances were provided to extract the gasoline from casing-head gas at the wells, and the total amount thereafter paid as royalty on gas thus used was $2,471.89 up to January 31, 1924. Production under the new lease was greatly increased and royalties paid thereon amounted to $31,844.63. The new lease bound appellee to drill additional wells and it proceeded to do so at an expenditure of $25,000, which was the cause of the increased production.

The plaintiff called four witnesses to support her allegation that the lease, in addition to the royalties reserved, was of a value of not less than $75,000. One of them, an oil-producer, testified that he knew something about the value of oil properties on a per-barrel basis, that he had been upon the 80-acre tract, that the value of an oil and gas lease was arrived at by physical conditions the amount of production, the age, quality, depth of wells and a lot of circumstances, that he was familiar with the Bartlesville sand in that section, that he was not sure that all of the wells on the tract were in the Bartlesville sand, that he did not know what the reasonable value in 1916 with oil at $1.50 a barrel would be of a lease on 80 acres lying in Washington County in the Bartlesville sand immediately southeast of Bartlesville producing 26.2 barrels a day from five wells, that he was not familiar enough with the conditions to give an estimate of its value, he did not know what had been drilled around it, whether it had been condemned by dry holes, basing a value upon what it is actually producing would depend on whether it was on the edge or middle of the pool, and a lot of things, that he was not an expert, that he did not buy properties on a per-barrel basis, but they were bought on the physical conditions, taking all those things into consideration. Another of these witnesses was a lease broker, buying and selling oil properties. He said he was familiar in a general way with oil values and knew of the old lease on the tract. He presumed the wells upon it were in the Bartlesville sand, that he did not remember any special properties being sold in 1916, that an 80-acre farm with five producing wells producing 26 barrels a day, having two dry holes, the wells having been sunk in 1909, with oil at $1.50 a barrel, would be of the reasonable market value of from $1,500 to $1,800 a barrel, "*I would imagine.*" Thereupon the court said to the witness:

"Not imagine. You must know as an expert. You must know and give your reasons. Why do you say $1,500 a barrel?

"A. Well, I can't give you expert testimony on that."

Another of these four witnesses testified that he was in the oil business, that he was acquainted in a general way with the old lease on the 80 acres, that "a lease on 80 acres of land on which there are two dry holes and five producing wells, the wells sunk in 1909, and in 1916 producing 26 barrels per day, with oil worth $1.50, considering it with just the casing in the wells, would be worth $1,500 a barrel, or approximately $40,000."

On cross examination he said he did not know of any particular instances of property selling in June, 1916, for $1,500 a barrel, and did not know anything that would enable him to say that that was the fair market value, in June, 1916, other than he happened to be in business at Bartlesville at that time, that he was not an expert and did not pose as an expert. On motion to strike out the testimony of this witness the court said: "I will let it stay in, but it is not entitled to any consideration." The other of these four witnesses testified that he had been a producer in the oil business and had also been selling oil properties, that he knew of no sales on a barrel basis made in that part of the country in 1916, that he had never been on the leased premises, that he was not familiar with the old lease but knew of its production in a general way, that in 1916 values were computed on a barrel basis by taking the daily production, that a lease on 80 acres in this particular section which had five wells producing 26.2 barrels a day during the six months from January 1st to July 1, 1916, with oil at $1.50 per barrel, was worth about $40,000, that the reasonable value of properties of this character would be $1,500 per barrel for the daily production. The court asked him this question: "Did you ever sell any that old and that small for that much?" The question was not answered.

[1] This testimony is the basis of appellant's contention that the sale price of $1,000 for the new lease was grossly inadequate, so much so as to constitute in and of itself fraudulent conduct. The questions, comments and action of the court while these witnesses were on the stand clearly indicate that slight weight was given to their testimony; and with that we fully agree. One of these witnesses testified that although he had been upon the 80-acre tract and knew something of the conditions and the basic facts on which an opinion as to the value of the lease must be based, yet he did not know sufficiently in detail the physical conditions there and the necessary facts which would enable him to express an opinion as to the value of the lease. He appeared to be as fully qualified to give an opinion as any one of the four and to know more of the facts on which to base an opinion than any of them. Two of them admitted that they did not have sufficient knowledge of the subject-matter to qualify them to express an opinion. The other one had never been on the leased property and he knew of no sales made on the barrel basis in that part of the

country in 1916. So far as his testimony disclosed he ignored the effect of dry wells on and adjacent to the leased premises. He did not claim that he had ever made a sale on the basis which he set up, or that he had ever heard or knew of anyone else making a sale on such a basis. When asked about dry holes his response was that that would depend on where the dry holes were located. If his estimate of value was at all affected by the fact that some of these dry holes were on the tract and some immediately off it, it is not disclosed. We think the claim that appellee's bid for the lease was not a fair consideration and was grossly inadequate is not sustained by competent proof. So much for the fact on which appellant chiefly relies for the relief sought.

[2] But conceding for the sake of argument that the lease was worth a great deal more than appellee's bid, that fact standing alone did not entitle appellant to a decree. The sale of the lease on June 19, 1916, was a judicial sale by a court having plenary jurisdiction over the parties and the subject-matter. Crabtree v. Bath, 102 Okl. 1, 225 P. 924; Abraham v. Homer, 102 Okl. 12, 226 P. 45; Tucker v. Leonard, 76 Okl. 16, 183 P. 907; Thaw v. Falls, 136 U. S. 519, 548, 10 S. Ct. 1037, 34 L. Ed. 531. That sale was confirmed by the court, and it is the established rule that after confirmation there can be no cancellation of the sale solely on the ground that the price bid was inadequate. In Morrison v. Burnette, 154 F. 617, 624, 83 C. C. A. 391, 398, this court said:

"Hence the rule is settled, and it seems to be universally approved, that after confirmation of a judicial sale neither inadequacy of price, nor offers of better prices, nor anything but fraud, accident, mistake, or some other cause for which equity would avoid a like sale between private parties, will warrant a court in avoiding the confirmation of the sale or in opening the latter and receiving subsequent bids."

In Pewabic Mining Co. v. Mason, 145 U. S. 349, 367, 12 S. Ct. 887, 892 (36 L. Ed. 732) it is said: After confirmation of a judicial sale "the rights of the purchaser are vested, and something more than mere inadequacy of price must appear before the sale can be disturbed. Indeed, even before confirmation the sale would not be set aside for mere inadequacy, unless so great as to shock the conscience." See also In re Burr Mfg. & Sup. Co., 217 F. 16, 21, 133 C. C. A. 126.

[3] Appellant, however, contends that other facts show there was actual fraud. They will be considered. The guardian testified that Mr. Cook, a representative of appellee, came to see him about a new lease. He made the proposition as to what appellee was willing to give for it, and the guardian told him he would consider it. Mr. Cook at that time handed him the petition, an order for sale of the lease, and notice of the sale. The guardian then talked with the probate judge in regard to Mr. Cook's proposition. He also talked with Mr. Patton and Mr. Starr, who were oil men, and advised with them about it. They were familiar with the oil business. After he had had these conferences he filed the petition. He thought the proposition of Mr. Cook to drill new wells at once, in addition to agreeing to bid as much as $1,000, would be a good thing for the ward's interest. He sold the lease in the court room on one of the usual lease-selling days. No one else than appellee made a bid. He had no lawyer to represent him. He was a lawyer himself. The petition set out the facts as to what appellee would bid for the new lease and its terms. It did not request that the lease be sold to appellee for $1,000, and the court did not so order. Its order was that it be sold for not less than $1,000 and a royalty of not less than one-eighth of the production. Mr. Cook testified that he discussed with the guardian the terms and conditions of the lease that appellee was willing to take, and that the guardian agreed to put the lease up at a minimum price of not less than $1,000, with an agreement to drill additional wells and pay a royalty on casing-head gas. At that time no arrangements were made for saving the casing-head gas or extracting therefrom the gasoline. It would be expensive to do so. The old lease had a definite date for expiration and appellee did not care to make additional expenditures under that lease. He never saw the guardian after his first interview with him until the day of the sale, when he made the bid for appellee, nor did he see the guardian thereafter until at the trial of the case in the court below.

Counsel argue in their brief that it was fraudulent concealment and deception not to have disclosed in the notice of sale that the property was then producing and that the new lease would take immediate effect, and that thereby others who might have been disposed to bid were left in uncertainty. There is no proof that any prospective bidder was in that state of mind, nor do the facts relied on tend to show that they would have had that effect. Furthermore, a complete answer to the argument lies in the fact that the court would have answered the inquiry if there had been anyone in doubt who desired to make it. The guardian's petition was on file. It stated the facts. The argument rests upon pure theory. It is unreasonable to assume that anyone would have made a bid without knowing the then condition of the property and all other facts that a reasonably intelligent bidder would ordinarily want to know. All of the possible contingencies that are now conceived would have been for the court's consideration and settlement had they arisen. It is unreasonable to assume that the court would have approved a lease to anyone beginning three years and seven months in the future, or that anyone in the leasing business who cared to bid would not have asked about it if in doubt. There is no statute of the State regulating the procedure in the sale of an oil lease on a ward's lands, but in 1914 the supreme court adopted a rule governing the procedure which has been adjudged controlling, Carlile v. Nat'l Oil & Development Co., 83 Okl. 217, 201 P. 377, wherein it is provided that such leases must be sold in open court to the highest and best responsible bidder, that petitions for the approval of such leases shall be filed at least five days before the same are to be sold, and that notice of such sale must be given by posting and publication where publication is practicable. All of these requirements were complied with. That court, in Adams v. Tidal Oil Co., 237 P. 443, said (page 444):

"It will be observed that the rule does not specify the form or contents of the notice, but the practice has always been to merely specify in the notice the description of the land to be leased, the time and place the lease would be sold, and the terms of the sale, all of which were embraced in the notice complained of. We cannot agree with plaintiff's contention that the notice should specifically mention the fact that the property had been developed and was equipped and had 9 producing wells on it."

The court further said:

"He [plaintiff] does not allege or claim fraud other than his statement that the property sold for less than its value, claiming that the inadequacy of the consideration constitutes fraud. With this contention, as applied to the facts herein as disclosed by the record, we cannot agree. The record discloses that the lease was sold after due notice was given by posting and publishing, at public auction, to the highest and best bid-

der; the sale was reported to and approved by the county court, and appears upon its face regular in every respect, and, in our judgment, the record discloses no facts which indicate anything other than a fair sale as provided by law. This court has repeatedly held that in probate matters county courts of the state are courts of record, and that their decisions on matters properly before them, in the absence of a specific showing of fraud, are as final and conclusive as are the decisions of the district courts in matters properly tried by those courts."

It is further argued that appellee, on its bid acquired casing in the wells then on the tract which, by appellant's testimony, was shown to have a value of about $1,400. Under the old lease it was provided that all buildings and improvements upon the land should remain a part thereof and become the property of the owner of the land, except the lessee was given the right to remove therefrom as his property the casing of all dry or exhausted wells at any time before the expiration of sixty days from the termination of the lease, whereas in the new lease there is this clause:

"Lessee shall have the right at the termination of this lease and for sixty days thereafter to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing."

On these provisions it is argued that by the new lease the appellee acquired casing then in the wells which, under the terms of the old lease, belonged to the lessor. We think this contention without merit, because, first, the provision in the new lease was clearly intended to apply only to casing placed in the wells under the new lease, and secondly, because if there was any casing then in the wells which belonged to appellant it was not sold to appellee on June 19, 1916. Under the Oklahoma statute it could not be sold without first advertising a sale thereof, whether we consider it as a part of the realty or as personal property. There was no petition filed to sell it, no notice given to sell it and no order of the court directing that it be sold. In the guardian's petition he asked for an order to sell the lease, and that was all that he was directed to sell and could sell, and the sale of the lease was the only sale that the court approved and confirmed.

It is also said that the handing to the guardian by appellee's agent of the petition, order of sale and notice of sale are suspicious circumstances indicative of a fraudulent purpose and understanding be-

8 F.(2d)—16

tween the guardian and the lessee. The order and notice seem to be the common forms used. The petition, in addition to the facts ordinarily embodied therein, contained a statement of what appellee was willing to do. There was nothing contained in either or omitted therefrom that induces an inference of fraud. The guardian told the agent he would consider the matter. He did so, and consulted with those who were informed and in whom he had confidence. He laid the proposition before the court, then filed the petition. He believed that the proceedings thus initiated would be to his ward's benefit, even if no greater sum than $1,000 should be bid, and the result has been beneficial, as the guardian believed it would be and as the court found it would be. As we view the record, the guardian would have been negligent had he not proceeded as he did. We think the proof fails to show fraudulent conduct on the part of anyone, either in the probate proceedings or extraneous thereto; and there is no occasion to consider the difference in application that must be made between intrinsic and extrinsic fraud, discussed in National Surety Co. v. Bank, 120 F. 593, 56 C. C. A. 657, 61 L. R. A. 394, and Chicago, R. I. & P. R. Co. v. Callicotte (C. C. A.) 267 F. 799, 16 A. L. R. 386.

The decree appealed from is affirmed